590 F.2d 470
 Dr. Joseph T. SKEHAN
v.
BOARD OF TRUSTEES OF BLOOMSBURG STATE COLLEGE and Dr. Robert
Nossen and Dr. Charles Carlson and John Pittenger,
Superintendent of Education, Commonwealth of Pennsylvania
and Bloomsburg State College. Dr. Joseph T. Skehan,
Appellant in No. 77-2311,
Board of Trustees of Bloomsburg State College and Dr. Robert
Nossen and Dr. Charles Carlson and John Pittenger,
Superintendent of Education, Commonwealth of Pennsylvania
and Bloomsburg State College, Appellants in No. 77-2312.
 Nos. 77-2311, 77-2312.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 29, 1978.
Decided Dec. 21, 1978.
 
 Cletus P. Lyman, Richard A. Ash, Lyman & Ash, Larry D. Glass, Philadelphia, Pa., for appellant in No. 77-2311.
 Allen C. Warshaw, Howard M. Levinson, J. Justin Blewitt, Jr., Deputy Attys. Gen., Gerald Gornish, Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellants in No. 77-2312.
 Before SEITZ, Chief Judge, HUNTER, Circuit Judge, and LACEY*, District Judge.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Plaintiff, Dr. Joseph T. Skehan (appellant in No. 77-2311), appeals from the following aspects of a final judgment entered by the district court, embodied in three separate orders and opinions: 1) a denial of Skehan's motion for judgment in his behalf on a claim that his contract as a faculty member of Bloomsburg State College was not renewed beyond the 1970-71 academic year for reasons violative of the first amendment; 2) a denial of Skehan's request for an award of monetary damages from either the College or the individual defendants as a remedy for the defendants' violation of his due process rights with respect to both his nonrenewal and his later dismissal from the College faculty; 3) a denial of Skehan's request that he be awarded equitable relief in the nature of full reinstatement to the College faculty as a remedy for the defendants' violations of his constitutional rights; and 4) a denial of Skehan's claim for attorney's fees and expenses.
 
 
 2
 Defendants, Bloomsburg State College, its Board of Trustees, Dr. Robert Nossen (President of the College during the period in which the events culminating in this lawsuit transpired), Dr. Charles Carlson (acting President of the College at the time Skehan filed his complaint) and John Pittenger (Pennsylvania Superintendent of Education) (appellants in No. 77-2312), cross-appeal from that aspect of the district court's judgment finding that Skehan was contractually entitled to an "academic freedom" hearing following his nonrenewal and that their failure to provide him with such a hearing violated his rights under the due process clause of the fourteenth amendment.
 
 Factual Background
 
 3
 The history of this litigation over the course of the past eight years may be garnered from the two previous opinions of this Court and the three opinions of the district court at issue here. The facts essential to an appreciation of the questions presented in this appeal are recounted herein.
 
 
 4
 Dr. Skehan was appointed as a non-tenured Associate Professor of Economics at Bloomsburg State College in January, 1969. His contract was renewed for the 1969-70 academic year, but on February 27, 1970, the College's Board of Trustees, on the recommendation of defendant Nossen, decided that Skehan should be notified that the 1970-71 academic year would be the terminal year of his appointment. Skehan was notified of the Board's action through a letter from President Nossen, dated May 19, 1970.
 
 
 5
 On September 21, 1970, Skehan wrote Nossen a letter invoking Article 5e of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College (hereinafter Article 5e). In that letter he alleged that the decision not to reappoint him after 1970-71 had been caused by considerations violative of his academic freedom.[1] Nossen did not refer Skehan's letter to the Committee on Professional Affairs, the College body charged with initiating proceedings under Article 5e to resolve such allegations, nor did Skehan take any further action to secure an Article 5e hearing.
 
 
 6
 Contemporaneous with his invocation of Article 5e, Dr. Skehan became embroiled in a dispute between the economics department and the College's administration concerning the scheduling of classes. During that dispute Skehan was warned that his failure to teach his classes as scheduled by the College would result in the taking of immediate and direct administrative action against him. On or about October 1, 1970, Dr. Skehan was observed teaching a course not assigned to him, and on October 9 Dr. Nossen notified Skehan that he was relieved of all classroom responsibilities pending a final hearing. Nossen's letter of October 9 also demanded of Skehan a "full and complete accountability" of his actions on campus since the start of the semester. When Skehan failed to comply with this demand, Dr. Nossen informed him that, effective October 17, 1970, he was removed from the College's payroll, subject to final approval by the Board of Trustees. That approval was obtained at the Board's regularly scheduled meeting of October 23, 1970.
 
 
 7
 Skehan filed a complaint in district court on October 10, 1972. He alleged that his suspension and ultimate dismissal in the Fall of 1970 were in retaliation for his active role in campus political issues, and hence were violative of his rights under the first amendment. He also alleged that the defendants suspended and dismissed him without complying with the applicable College laws and regulations governing faculty status, thereby depriving him of that due process of law guaranteed by the fourteenth amendment. He requested preliminary and permanent injunctive relief in the nature of reinstatement and an award of attorney's fees.
 
 
 8
 The district court held a hearing on Skehan's request for a preliminary injunction on January 11 and 12, 1973. Preliminary injunctive relief was denied in an opinion and order dated January 31, 1973. Skehan v. Board of Trustees of Bloomsburg State College, 353 F.Supp. 542 (M.D.Pa.1973). Subsequently, the parties stipulated that a final hearing could be held on the record developed at the preliminary injunction hearing, and the district court issued its opinion on the merits on May 9, 1973. Skehan v. Board of Trustees of Bloomsburg State College, 358 F.Supp. 430 (M.D.Pa.1973).
 
 
 9
 In that opinion, the district court held that Skehan's dismissal from the faculty had been a result of his actions during the scheduling dispute. Thus, his dismissal was found not to have been violative of the first amendment. However, the district court did find that Skehan's dismissal during the term of his contract entitled him, under the due process clause, to a prior hearing on the grounds of his dismissal, and that such a hearing had not been afforded Skehan by the College.
 
 
 10
 On appeal this Court affirmed both findings with respect to Skehan's dismissal, but noted that Skehan had also challenged the constitutionality of the Board of Trustees' decision not to renew his contract beyond 1970-71. Thus, this case was remanded to the district court for findings on the questions whether the nonrenewal decision had been motivated by the College administration's disagreement with Skehan's stands on campus issues and whether Article 5e had contractually entitled Skehan to a hearing on the reasons for his nonrenewal. This Court also directed the district court to consider whether the College shared in the sovereign immunity of the Commonwealth of Pennsylvania so that it would be immune under the eleventh amendment from Skehan's claim for damages. We held that the individual defendants were entitled to absolute immunity from damages as executive officials exercising discretionary governmental functions, and indicated that Skehan might be entitled to an award of attorney's fees from the College as a private attorney general vindicating a public interest. Skehan v. Board of Trustees of Bloomsburg State College, 501 F.2d 31 (3d Cir. 1974).
 
 
 11
 Trial on the issues remanded to the district court was postponed while Skehan's petition for writ of certiorari to the Supreme Court was pending. On May 27, 1975, the Supreme Court granted his writ, vacated the judgment of this Court, and remanded the case "for further consideration in light of Alyeska Pipeline Service Co. v. Wilderness Society, (421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)), and Wood v. Strickland, 420 U.S. 308 (, 95 S.Ct. 992, 43 L.Ed.2d 214) (1975)." 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975). This Court reviewed the case en banc on remand from the Supreme Court, and addressed itself to three issues respecting the relief to which Skehan might be entitled for the defendants' actions in bringing about his nonrenewal and termination. Skehan v. Board of Trustees of Bloomsburg State College, 538 F.2d 53 (3d Cir. 1976).
 
 
 12
 First, we noted that Alyeska had overruled the cases upon which this Court had earlier relied in determining that Skehan, as a "private attorney general," was entitled to an award of attorney's fees. Thus, the attorney's fees aspect of the case was remanded to the district court for findings on pre-litigation obduracy, and for consideration of an award of fees based on the defendants' future maintenance of this litigation in bad faith. This Court held that only the latter ground could be the basis of a fee award against the College given that it was a state agency for which the Commonwealth of Pennsylvania claimed sovereign immunity. 538 F.2d at 55-59.
 
 
 13
 Second, we noted that the Supreme Court had demonstrated in Wood v. Strickland that this Court's earlier holding that the individual defendants were absolutely immune from liability as nonjudicial government officials performing adjudicatory functions was inappropriate. Thus, the question of official immunity was remanded to the district court for findings of fact with respect to the immunity of each defendant under the test articulated by the Supreme Court in Wood. Id. 59-62.
 
 
 14
 Finally, this Court stated that an intervening decision of the Pennsylvania Commonwealth Court Brungard v. Hartman, 12 Pa.Cmwlth. 477, 315 A.2d 913 (1974), holding that state colleges are agencies for which Pennsylvania claims sovereign immunity, was dispositive of the eleventh amendment issue concerning the College's liability for damages. Thus, we held that a back pay award could not be made out of the College's treasury, and that an award of attorney's fees against the College could only be based on the exception to the American rule for the maintenance of litigation in bad faith. 538 F.2d at 62.
 
 
 15
 In conclusion, this Court reiterated that on remand the district court was to make findings of fact on the nature of the interest created by Article 5e and on whether the decision not to renew Skehan's contract beyond 1970-71 had been impermissibly based on his stands on campus issues. The Supreme Court denied defendants' petition for a writ of certiorari on November 29, 1976. 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).
 
 
 16
 It is with this background in mind that we turn to the parties' challenges to the district court's disposition of the issues remanded to it by this Court.
 
 I. THE FIRST AMENDMENT CLAIM
 
 17
 The district court issued its first opinion after remand on plaintiff's and defendants' cross-motions for judgment on Skehan's claim that the decision not to reappoint him after 1970-71 was for reasons violative of the first amendment. Skehan v. Board of Trustees of Bloomsburg State College, No. 72-644 (M.D.Pa., filed March 24, 1977) (unpublished opinion). The district court awarded judgment to the defendants on that claim. Three aspects of that ruling are at issue in this appeal. First, the defendants contend that the district court erred in rejecting their argument that Skehan's first amendment claim was barred by the applicable Pennsylvania statute of limitations. Skehan appeals from the court's disposition of the merits of the first amendment claim, and also contends that the court abused its discretion in denying his motion to take additional testimony on that issue.
 
 
 18
 Before meeting those contentions we must address the defendants' argument that the district court's disposition of the first amendment claim should be affirmed because it was not raised by Skehan in his complaint or in any court proceedings, but rather was first raised by this Court Sua sponte in the 1974 panel opinion. We believe that Skehan's initial complaint did challenge the validity of the nonrenewal decision, and that the question whether that decision was violative of the first amendment was litigated by the parties at the preliminary injunction hearing held in January, 1973. In fact, the district court decided not to take additional testimony on the first amendment nonrenewal issue after remand precisely because the parties had had a full opportunity to present all evidence concerning the reasons which may have motivated the Board's decision not to renew Skehan's contract at that earlier hearing. See Part I, B Infra. Moreover, this Court's en banc opinion remanding the first amendment issue to the district court represents the "law of the case" with respect to that aspect of Skehan's claim. We are bound by the earlier determination of this Court, and thus reject the defendants' argument, raised at this late date, that the issue should not have been remanded to the district court. See Part II, A Infra.
 
 A. Statute of Limitations
 
 19
 The district court found that Skehan's nonrenewal claim stated a cause of action under 42 U.S.C. § 1983. Because § 1983 does not contain its own statute of limitations, the court turned to Pennsylvania law to determine the period of limitations applicable to the most analogous state law claim. The court held that the six year statute of limitations established by the Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31, governed Skehan's claim, as it governed the state law claim the court found to be most analogous to it, namely a claim of wrongful interference with an employment contract. Defendants argue that the court erred in holding the six year period of limitations applicable to Skehan's claim, contending that the two year period of limitations established for personal injury actions in the Act of June 24, 1895, P.L. 236, § 2, 12 P.S. § 34, should be applied to a § 1983 action claiming a violation of the first amendment. They further contend that Skehan's nonrenewal claim arose on the day he was notified of the Board's decision not to reappoint him beyond 1970-71, at the latest May 19, 1970, and that his claim should thus be barred because he did not file his complaint in federal court until October 10, 1972.
 
 
 20
 Skehan counters that even if the two year period of limitations established in 12 P.S. § 34 applies to his first amendment claim, that claim is not barred because his cause of action did not accrue until he was terminated on October 19, 1970. He reasons that up until that time a final nonrenewal decision had not been made in his case, because, until then, he was entitled to expect the College to respond to his letter of September 21, 1970, invoking the procedures of Article 5e to review the Board's initial decision not to renew his contract.
 
 
 21
 We need not resolve the parties' dispute over the date when Skehan's nonrenewal claim accrued because we agree with the district court's determination that it was governed by the six year period of limitations established in 12 P.S. § 31; thus, whether Skehan's claim is deemed to have accrued in May or in October of 1970, he filed his complaint well within the period of limitations.
 
 
 22
 Two recent opinions of this Court compel our disposition of this question. In Meyers v. Pennypack Woods Home Ownership Association, 559 F.2d 894 (3d Cir. 1977), this Court faced the question whether a cause of action under 42 U.S.C. §§ 1981 and 1982, alleging racial discrimination by a private home ownership association, was governed by Pennsylvania's two year or its six year statute of limitations. The Court noted that the Pennsylvania scheme of limitations is complex, due to the establishment of a six year period for all actions in contract and all actions of trespass by the Act of 1713, while the Act of 1895, without reference to the earlier statute, provides a two year period for actions for personal injury not resulting in death. The Court noted that the Pennsylvania Supreme Court has held (citing Walker v. Mummert, 394 Pa. 146, 146 A.2d 289 (1958) and Helmig v. Rockwell Manufacturing Co., 389 Pa. 21, 131 A.2d 622 (1957) ) that the Act of 1713 still governs all actions in trespass not involving personal injury. 559 F.2d at 902. Elaborating further, this Court stated that 12 P.S. § 34 "by its terms applies only to 'actions brought to recover damages' whereas (the plaintiff) seeks a broad range of equitable relief," and that the statutory phrase " 'injury wrongfully done to the person, in cases where the injury does not result in death' expresses a limitation only on actions for bodily injury whereas (plaintiff's) claim is for tortious interference with his right to contract for the purchase of a house." Id. (footnote omitted).
 
 
 23
 In Davis v. United States Steel Supply, 581 F.2d 335 (3d Cir. 1978), this Court reversed a district court decision, relied upon by the defendants here, that had held the two year period of limitations in 12 P.S. § 34 applicable to a cause of action challenging racially discriminatory employment practices brought pursuant to 42 U.S.C. § 1981. Relying on Meyers, supra, the Davis Court noted that § 34 is applicable only to actions seeking damages for bodily injury. 581 F.2d at 339. The Court held that the plaintiff's cause of action in Davis, alleging "an unlawful breach of an existing at-will employment contract" was within the precise terms of 12 P.S. § 31, and was best analogized to "those torts which involve the wrongful interference with another's Economic rights or interests." Id. 339 (footnote omitted) (emphasis supplied).
 
 
 24
 The district court properly noted that Skehan's claim, like the plaintiff's in Davis, most resembled the state law claim of wrongful interference with a contract, and that it did not seek damages for a bodily injury but rather for economic loss. In affirming the district court's determination that 12 P.S. § 31 provides the applicable statute of limitations for Skehan's claim, we also rely on the fact that Skehan did not seek damages alone for the College's allegedly unlawful nonrenewal of his contract, but a broad range of equitable relief as well. See Meyers, supra, at 902. We agree with the ruling of the district court denying defendants' motion for judgment on the ground that the first amendment claim was barred by the statute of limitations.[2]
 
 
 25
 B. Skehan's Motion to Take Additional Testimony
 
 
 26
 As noted earlier, the district court, on remand, denied Skehan's motion to take additional testimony on the question whether the College's nonrenewal decision had been based on considerations violative of the first amendment. That order, dated January 10, 1977, was based on the fact that Skehan had rested on all issues presented in his complaint following the preliminary injunction hearing in January, 1973, and that during that earlier hearing he had been presented with a full opportunity to introduce evidence concerning the reasons that may have motivated the nonrenewal decision. In the same order denying Skehan's motion the district court granted defendants' motion to take additional testimony on the question of their official immunity defenses, stating that this question had not been before the court in 1973 and that the law in this area had substantially changed in the interim. Skehan contends that the court's order was an abuse of discretion for a variety of reasons: that it was inconsistent with this Court's remand for findings of fact on the first amendment issue; was unjust given that the court applied a test to the merits of the claim that had been formulated by the Supreme Court in 1977; was inconsistent with the court's decision to allow additional testimony on the defendants' official immunity defense; caused the court to decide the issue on a stale record; was inconsistent with the court's earlier orders respecting pre-trial discovery; and prevented plaintiff from producing a great quantity of probative evidence.
 
 
 27
 It is clear that "(g)enerally, whether a trial court will reopen a case to take more testimony is discretionary with that court." Rochez Brothers, Inc. v. Rhoades, 527 F.2d 891, 894 n. 6 (3d Cir. 1975), Cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). The contention that Skehan presses most vigorously in arguing that the trial court abused that discretion in this instance is that by not taking additional testimony on the first amendment claim the district court failed to comply with the mandate of this Court to make findings of fact on the causes of Skehan's nonrenewal. To the contrary, however, neither opinion of this Court specifically instructed the district court to take further evidence on any issue remanded to it for findings of fact. In fact, we feel that there was an assumption implicit in those opinions that the trial court need not reopen the record of this case for further testimony on the first amendment issue in order to make the required findings.
 
 
 28
 This Court was fully aware that the parties had stipulated that the district court could hold a final hearing on the record developed at the preliminary injunction hearing in January, 1973. See 501 F.2d at 37. Yet, it was only with respect to the issue of the individual defendants' official immunity that this Court indicated that the record might have to be reopened in order to make the required factual determinations, and that decision was left to the district court in the first instance. See 538 F.2d at 62. Thus, contrary to Skehan's contention that the trial court's denial of his motion to take additional testimony was inconsistent with the mandate of this Court, this Court's failure to specify that further evidence should be taken on remand could, at most, be construed as leaving a decision on the need to reopen the record to the sound discretion of the trial court. See Rochez Brothers, supra at 894 (failure of appellate court to instruct the district court to take further evidence indicates that the question was left to the sound discretion of the trial court).
 
 
 29
 Our scope of review on this question is quite limited. As Professor Moore has stated:
 
 
 30
 A district court, then, should consider a motion to take additional testimony in light of all the surrounding circumstances and grant or deny it in the interest of fairness and substantial justice. . . . (T)he grant or denial involves an exercise of discretion by the trial court; and because this court has a feel for the case that an appellate court can seldom have, the trial court's ruling is subject to reversal only in a rare case where abuse is clearly shown.
 
 
 31
 6A Moore's Federal Practice P 59.04(13) at 36-37 (2d ed. 1974) (footnotes omitted). In Rochez Brothers, supra at 894 n.6, this Court stated that the district court should be concerned with several factors in deciding whether to reopen a case, including the burden which would be placed on the parties and their witnesses, undue prejudice which might result by a refusal to take new testimony, and considerations of judicial economy.
 
 
 32
 The district court was clearly concerned with the burdens placed on the parties and the court system by the failure of that system to dispose of the dispute in this case promptly and fairly. That theme is prominent throughout the court's numerous pre-trial orders attempting to bring the parties into court for resolution of the issues remanded by this Court. Following a final pre-trial conference on December 1, 1976, the court directed that the parties file motions for the taking of such additional testimony on those issues as they deemed advisable. In spite of Skehan's contention to the contrary, we do not find that the district court in prior orders had indicated to the parties that there would be further testimony taken on the first amendment issue. In its order of January 10, 1977, the court, after considering all the points raised here by Skehan, save one that is discussed below, denied his motion to reopen the record on the first amendment nonrenewal claim. The court relied on the fact that Skehan had had a full opportunity to present evidence on the defendants' motivation in declining to renew his contract beyond 1970-71 at the preliminary injunction hearing; any responsibility for inadequacies in that presentation was deemed to rest with Skehan. Furthermore, the court determined that the real thrust of Skehan's request was to insure that he would have an opportunity to rebut any evidence offered by the defendants on the question of their official immunity from an award of damages arising from the alleged first amendment violation. The court offered Skehan the opportunity to present such rebuttal evidence if the issue of official immunity from liability were to arise.
 
 
 33
 We believe that the concerns raised here by Skehan, and rejected by the district court, do not compel a conclusion that the trial court abused its discretion in denying his motion to take additional testimony on the first amendment nonrenewal claim. This is not one of the exceptional cases envisioned in Rochez Brothers, supra at 894-95, in which a party failed to put into evidence all the necessary elements of his claim because of a misunderstanding among the parties and the trial court; nor was the trial court unable to make findings of fact on the nonrenewal claim without the proffered testimony. See Pittsburgh Press Club v. United States, 426 F.Supp. 553, 554 (W.D.Pa.1977), Aff'd in relevant part, 579 F.2d 751, 755 (3d Cir. 1978). Rather, as Skehan concedes, at the time of the preliminary injunction hearing, the district court and the parties probably considered the question of the College's motivation in its nonrenewal of Skehan to be merged with the first amendment challenge to his dismissal. Thus, Skehan did present evidence with respect to his first amendment activities, and the College's reaction to them, relevant to the whole period of his employment by the College. The district court in no way hindered him from offering proof that the nonrenewal decision was motivated by his engaging in conduct protected by the first amendment. Skehan's counsel made a tactical judgment to rest on the record made at the preliminary injunction hearing and, based on that record, the district court was able to detail Skehan's campus activism prior to the nonrenewal decision in the Spring of 1970 in twelve findings of fact contained in its opinion on the merits of the first amendment claim, discussed below.
 
 
 34
 Skehan has presented one contention for the consideration of this Court that, of necessity, he did not present to the district court prior to its order of January 10, 1977. That contention is that the district court should have reversed its order denying his motion to present additional testimony on the first amendment issue when it became aware of the change in the law represented by the decision of the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The Mt. Healthy decision was issued by the Supreme Court on January 11, 1977, one day after the district court's order denying Skehan's motion, but prior to the court's ruling on the merits of the first amendment claim on March 24, 1977, in which it relied on the test of causation formulated in Mt. Healthy.
 
 
 35
 Skehan is correct in his assertion that a change in legal standards may warrant the reopening of a case where additional testimony would be pertinent to the change of law. See 6A Moore's Federal Practice P 59.04(13) at 36 (2d ed. 1974). In fact, the district court relied on this ground in deciding to grant the defendants' request to take additional testimony on the official immunity defense. However, we believe that the Mt. Healthy decision did not reflect a change in the law that would warrant the district court's reopening of the record in this case to allow Skehan to present additional testimony on his claim that the defendants' decision not to reappoint him beyond 1970-71 violated the first amendment.
 
 
 36
 Mt. Healthy did not substantially affect the affirmative burden of a plaintiff in Skehan's position to show by a preponderance of the evidence that his first amendment activities were a substantial or motivating factor in an adverse employment decision. The standard of proof adopted in Mt. Healthy is, if anything, more stringent than the standard applied by the district court in its ruling in 1973 that Skehan had failed to prove he had been terminated for reasons violative of the first amendment, 358 F.Supp. at 434 a ruling affirmed by this Court, 501 F.2d at 39. To the extent the Mt. Healthy Court adopted a "new" formulation of the test of causation for claims alleging dismissal from public employment for reasons violative of the first amendment, the "new" aspect of that formulation was the Court's holding that the defendants in such a case must be afforded an opportunity to rebut a prima facie case of impermissible motivation by showing by a preponderance of the evidence that they would have reached the same decision even in the absence of the constitutionally protected conduct of plaintiff. 429 U.S. at 284-87, 97 S.Ct. 568. Because Skehan was permitted to adduce all testimony relevant to his first amendment nonrenewal claim at the preliminary injunction hearing, and because no evidence pertinent to his affirmative case after Mt. Healthy would not have been equally pertinent then, we cannot say that Skehan was prejudiced by the court's application of a "new" legal standard to his first amendment claim.
 
 
 37
 We conclude that it was not an abuse of discretion for the district court to have declined to reopen that aspect of the record of this case dealing with Skehan's claim that the College's decision not to renew his appointment beyond 1970-71 violated the first amendment.
 
 C. The Merits of the First Amendment Claim
 
 38
 The district court found that the evidence adduced by Skehan at the preliminary injunction hearing failed to establish by a preponderance of the evidence that his constitutionally protected conduct was a "substantial" or "motivating" factor in the decision of the Board of Trustees to offer him a terminal contract for the 1970-71 academic year. See Mt. Healthy, supra at 287, 97 S.Ct. 568. Furthermore, the court went on to find that even if Skehan had met that initial burden, the defendants had shown by a preponderance of the evidence that Skehan's contract would not have been renewed beyond that year even if he had not spoken out on campus issues. See id. Having concluded that the court's findings on Skehan's failure to meet his initial burden of proof are not clearly erroneous, we affirm the court's judgment on the first amendment nonrenewal issue.
 
 
 39
 The district court found as a fact that "Dr. Skehan assumed an activist position on many of the issues raised in the campus community, a position often grating to the administration of Bloomsburg State College." However, the court also found:
 
 
 40
 There is no evidence on the record to establish that the Board of Trustees based their decision not to renew Skehan's contract on his criticism of administrative policies or his comments on campus issues. Skehan has shown only that after he spoke out on campus issues his contract was not renewed. No evidence establishing a relationship or nexus between the two events has been presented.
 
 
 41
 Unpublished opinion of March 24, 1977, at 14.
 
 
 42
 Skehan argues that the district court's finding that there was no evidence connecting the College's nonrenewal decision with his first amendment activities should be set aside as clearly erroneous. He relies on the following passage from Dr. Nossen's letter to him, dated October 9, 1970, informing him that he was being relieved of classroom responsibilities for his actions during the scheduling dispute, as proof of the nexus the district court found lacking:
 
 
 43
 I hardly need remind you that you are, during this current year, on terminal appointment. You were, at the time that appointment was offered, advised that your Previous disruptive activities made your presence on this campus unwelcome, and the hope was expressed that you would not accept. (emphasis supplied).
 
 
 44
 Skehan contends that those "previous disruptive activities" must have been a reference to activities protected by the first amendment and that the foregoing passage proves that the College's nonrenewal decision was substantially motivated by considerations violative of the Constitution. The district court found, however, that the phrase could have been a reference to Skehan's refusal to meet his classes at the appointed times. There was testimony introduced at the preliminary injunction hearing by Skehan's department chairman that prior to Skehan's nonrenewal he had arranged, without approval and contrary to past instructions, to have other faculty members take charge of his classes.
 
 
 45
 It is also possible that the "disruptive activities" referred to by Dr. Nossen in his letter of October 9 were the same activities he mentioned in an earlier letter of June 15, 1970, admitted into evidence at the preliminary injunction hearing as defendants' exhibit 12. In that letter, reaffirming the Board of Trustees' determination that Skehan's appointment for the 1970-71 academic year was to be a terminal contract, Dr. Nossen stated:
 
 
 46
 The Board members have expressed deep concern over your continued failure to cooperate with your Department Chairman, to meet established departmental deadlines, and to contribute to constructive departmental operation. Your Chairman has, in desperation, requested that you no longer attend departmental meetings and that you report, should you return for 1970-71, to the Dean of Instruction rather than to him.
 
 
 47
 Whatever the true meaning of the phrase "disruptive activities" in the October 9 letter might be, we can find no error in the district court's determination that Skehan failed to establish by a preponderance of the evidence that Dr. Nossen acted to prevent the renewal of Skehan's contract because of his disagreement with Skehan's avowed positions on campus issues. Moreover, there is no evidence that the members of the Board of Trustees were even aware of Skehan's first amendment activities at the time they approved the decision not to renew his contract. Such a failure of proof requires that we credit the district court's evaluation of the testimony and affirm, as not clearly erroneous, its finding of fact that "Skehan's criticism and disagreement with the administration, specifically Dr. Nossen and the Board of Trustees . . . concerning certain campus issues . . . was not a motivating or substantial factor in the decision not to renew his contract of employment beyond the 1970-1971 year." Unpublished opinion of March 24, 1977, at 7. See Franklin v. Atkins, 562 F.2d 1188, 1192 (10th Cir. 1977); Cf. Mazaleski v. Treusdell, 562 F.2d 701, 716 (D.C.Cir. 1977) (Mt. Healthy requires that a dismissed public employee's first amendment claim be supported by more than Post hoc ergo propter hoc allegations).
 
 
 48
 Having considered all of Skehan's arguments pertinent to this aspect of his appeal, we concur in the conclusion of the district court that Skehan did not establish that his first amendment activities were a substantial or motivating factor in the College's decision not to renew his contract beyond 1970-71. We need not review the district court's determination that, even if Skehan had established a prima facie case of a first amendment violation, the defendants proved by a preponderance of the evidence that he would have been offered a terminal contract based on reasons independent of his constitutionally protected conduct.
 
 
 49
 II. THE ARTICLE 5e PROCEDURAL DUE PROCESS CLAIM
 
 
 50
 On April 14 and 15, 1977, the district court heard testimony without a jury concerning, Inter alia, the nature of the interest created by Article 5e of the College's Statement of Policy for Continuous Employment and Academic Freedom, and whether Skehan's right to a hearing under Article 5e had been violated by defendant Nossen's failure to institute the proceedings called for by that provision upon receipt of Skehan's letter of September 21, 1970. In an opinion issued on May 18, 1977, the district court held that Skehan possessed a contractual right to the procedures set forth in Article 5e, that he had invoked that right within a reasonable time, and that the College's failure to afford Skehan those procedures violated the due process clause of the fourteenth amendment. Skehan v. Board of Trustees of Bloomsburg State College, 431 F.Supp. 1379, 1391 (M.D.Pa.1977).
 
 
 51
 The defendants' cross-appeal raises two challenges to that holding: first, they assert that the district court should not have considered the Article 5e claim, even though this Court has specifically instructed that it do so, because the claim was never raised by Skehan at any stage of this litigation; second, they contend that Skehan did not have a contractual right to the procedures set forth in Article 5e because the College's Statement of Policy was not a contract supported by consideration nor one whose obligations were set forth with sufficient certainty, because it had not been practical for the College to adhere to those procedures in Skehan's case, because Skehan's behavior during the scheduling dispute had discharged the College's obligation to provide him with an Article 5e hearing and because Skehan's letter to President Nossen was not a proper invocation of Article 5e. If we reverse the district court's finding that Skehan was contractually entitled to the procedures set forth in Article 5e, the defendants rightly conclude that Skehan would have no property interest in those procedures rising "to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).
 
 
 52
 A. Skehan's Alleged Failure to Raise the Article 5e Claim
 
 
 53
 The defendants argue that the district court's holding in Skehan's favor on the procedural due process claim should be reversed because it was error for the court to have addressed that issue in the first instance. The district court noted in its opinion on this issue that the Article 5e claim was never set forth in Skehan's complaint, never raised at the preliminary injunction hearing in January, 1973, never raised before this Court, and, in fact, "first surfaced in the Opinion of the Court of Appeals." 431 F.Supp. at 1382. The court also stated its view that Skehan's failure to raise the claim in his complaint ran afoul of the requirement that facts be pleaded with specificity in civil rights actions, and that the "creation" of the issue by this Court was inconsistent with our jurisprudential system. Id. Nonetheless, the court felt itself bound by the directions of this Court to fully consider the issue as though it had been initially raised by Skehan in his complaint.
 
 
 54
 Defendants rely on the foregoing observations of the district court as support for their argument here. Based on our independent review of the record of the preliminary injunction hearing, we decline to accept the validity of the district court's observations. Moreover, in the unanimous panel opinion of this Court entered on May 3, 1974, we stated that Skehan had presented a due process claim based on the College's failure to provide him with an Article 5e hearing and that the district court had failed to make findings of fact on that claim. 501 F.2d at 38. Thus, this Court remanded the case to the district court for findings "as to the nature of the interest created under Pennsylvania law by article 5(e) of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College . . . ." Id. 45. In our unanimous en banc opinion on remand from the Supreme Court, we again directed that findings be made on the Article 5e issue. 538 F.2d at 63. The defendants did not seek review of the original order of this Court; their petition for certiorari to the Supreme Court, filed after the issuance of our opinion en banc, did not raise the contention they now press that this Court impermissibly created the Article 5e issue Sua sponte. Thus, even if we were to agree with the defendants' contention and the district court's observations, we would have to rule that this Court's prior opinions represent the law governing this case with respect to the question whether it was permissible to remand the Article 5e claim to the district court.
 
 
 55
 B. The Merits of the Article 5e Due Process Claim
 
 
 56
 The district court held that the College's Statement of Policy "sets forth its purpose in terms that meet the general requirement that a contract be supported by consideration." 431 F.Supp. at 1388. The court found that the Statement had been adopted by the College to insure the more effective services of faculty members, and that during the period in which it was in effect each faculty member was given a copy of the Statement at the start of his term of employment and was asked to acknowledge in writing his familiarity with its provisions. Id. 1387-88. Thus, the court found the Statement to be an integral part of the contractual structure defining the employment relationship between the College and its faculty.
 
 
 57
 The defendants dispute the district court's characterization of the Statement as a contract, arguing that under Pennsylvania law it was not an enforceable agreement, but rather an "illusory promise," lacking in certainty with respect to the nature and extent of the obligations of the parties thereto. They base this argument on a clause in that section of the Statement's preamble labeled "Purpose," which provides: "It is understood that this is a statement of policy which will be honored in all practical situations." Because the College was required by the Statement to follow its procedures only when "practical" they argue that it was a promise merely in form.
 
 
 58
 The district court held, to the contrary, that the phrase "practical situations" can easily be interpreted by a factfinder and, hence, its presence in the Statement did not render its provisions unenforceable but rather permitted the College to avoid its obligations only by establishing that compliance in a given case was impractical. 431 F.Supp. at 1388. We believe the district court's ruling on this question to be consistent with applicable Pennsylvania law. See Kirk v. Brentwood Manor Homes, Inc., 191 Pa.Super. 488, 159 A.2d 48, 51 (1960).
 
 
 59
 The holding of the district court that the College's Statement of Policy was not an illusory promise, but a binding agreement that permitted the College to avoid its obligations thereunder only by establishing proof of impracticality, carries into effect the reasonable intention of the parties, articulated in the preamble of the Statement, that its provisions were adopted to protect the economic security of the faculty members at Bloomsburg State. That holding also comports with the determination of the Pennsylvania Supreme Court that in the area of contract enforceability the maxim " 'Id certum est quod certum reddi potest ' (that is certain which can be made certain)" should be applied. Portnoy v. Brown, 430 Pa. 401, 243 A.2d 444, 447 (1968).
 
 
 60
 The defendants also argue that the College had, in fact, determined that it would be impractical to comply with Article 5e in Skehan's case and that, absent proof that they had abused their discretion in making that determination, the district court should have respected their decision. They also defend the merits of their decision, arguing that it would have been impractical to afford Skehan an Article 5e hearing when he requested it on September 21, 1970, because he was, at that time, embroiled in the scheduling dispute with the College administration that ultimately led to his dismissal.
 
 
 61
 Findings of fact made by the district court, and supported by the testimony of President Nossen, belie the claim that the appropriate officers of the College made a reasoned determination that emergency conditions caused by Skehan's refusal to comply with administrative directives concerning the scheduling of classes compelled them not to comply with Article 5e in spite of Skehan's request that they do so. Rather, President Nossen did not respond to Skehan's invocation of Article 5e because he assumed, without reading the Statement, that the College's Committee on Professional Affairs was the appropriate body to initiate such proceedings. 431 F.Supp. at 1385. The district court also found that no evidence had been presented by the defendants in support of their contention that, given the scheduling dispute, it had been impractical for the College to implement the procedures of Article 5e in Skehan's case. Id. 1388. Thus, we find no error in the district court's determination that the defendants did not establish that proof of impracticality needed to avoid their contractual obligation to provide Skehan an Article 5e hearing.
 
 
 62
 Alternatively, the defendants argue that they were discharged from performing their contractual obligations to Skehan because he had materially breached his contract with the College by his actions during the scheduling dispute. This Court has already affirmed a prior holding of the district court that Skehan's participation in that dispute was a valid substantive ground for his dismissal, at least as a matter of constitutional law. 501 F.2d at 39. Skehan's dismissal is not at issue here, however; the claim now before this Court is that he was contractually entitled to a hearing into the reasons for his earlier nonrenewal. He requested such a hearing on September 21, 1970, which was found by the district court to be a reasonable time to initiate a complaint concerning his nonrenewal given that he was not formally notified of the Board's nonrenewal decision until May 19, 1970, and that the academic year ended on May 24 of that year. (The defendants do not challenge before this Court the reasonableness of the timing of Skehan's invocation of Article 5e.) Dr. Nossen did not deem it necessary to relieve Skehan of his classroom responsibilities because of his actions during the scheduling dispute until October 9, 1970. His preliminary decision to completely terminate the College's contractual relationship with Skehan was made on October 19, 1970, and affirmed by the College's Board of Directors on October 23. Thus, the record establishes that the defendants did not decide that Skehan's actions justified their termination of the College's contractual obligations to him until some four weeks after he had requested an Article 5e hearing. Under such circumstances we cannot agree that the defendants were discharged from their contractual obligations with respect to Skehan's challenge to his nonrenewal at any time prior to the date on which the College itself decided to treat his contract as terminated. During the interval between September 21 and October 19, 1970, Dr. Nossen made no attempt to set into motion the procedures of Article 5e. We agree with the holding of the district court that the College was not discharged from its obligation to do so by Skehan's failure to obey administrative directives during the scheduling dispute. We feel supported in this ruling by the observation of the district court that the very purpose of Article 5e would be defeated if the College were permitted to deny a faculty member a hearing on the causes of his nonrenewal whenever it asserted that his failure to perform his obligations to the College discharged the College's obligation to comply with Article 5e. 431 F.Supp. at 1388.
 
 
 63
 Finally, the defendants contend that it was error for the district court to hold that Skehan's letter of September 21, 1970, served as a proper invocation of Article 5e. They argue that the plain language of 5e and its context within the Statement of Policy supports their position that its proceedings were to be initiated by a letter to the College's Committee on Professional Affairs. The district court disagreed, finding the language of 5e to be ambiguous on the appropriate method of initiating its procedures, and holding that, although Skehan should have submitted a copy of his letter to the Committee, his failure to do so did not excuse the College's failure to act upon his request for a hearing. 431 F.Supp. at 1389. We believe that the district court's decision was amply supported by the terms of Article 5e and Skehan's letter.
 
 
 64
 Article 5e provided that the President of the College was required to explain to a nontenured faculty member the basis of a nonrenewal decision if that faculty member alleged an infringement of academic freedom. It also provided that such an allegation "shall be given preliminary consideration by the Committee on Professional Affairs . . . ." See note 1 Supra. In his letter to Dr. Nossen Skehan stated: "I hereby invoke article 5e . . . affirming that the decision not to re-appoint me has been caused by considerations violative of academic freedom." There was testimony given at the preliminary injunction hearing by a former dean of the College that upon receipt of Skehan's letter it would have been the President's responsibility to refer the matter to the Committee on Professional Affairs. Thus, there is evidence to support the district court's implicit holding that, given the ambiguity in the language of Article 5e, Skehan's pointed invocation of its procedures by letter to the President of the College was an appropriate means to initiate those procedures.
 
 
 65
 The district court held that Skehan had a property interest in the procedures of Article 5e and that the failure of the College to initiate those procedures upon his request violated the due process clause of the fourteenth amendment. The court's conclusions are consistent with applicable Pennsylvania law and with the purpose of the Statement of Policy to provide a procedural structure to the College's employment relationship with its faculty. The district court's finding that the College breached its contractual obligations in Skehan's case, and hence violated procedural due process, is amply supported by the record. Thus, we affirm that aspect of the district court's judgment and proceed to a consideration of whether the relief awarded Skehan by the district court was appropriate.
 
 III. RELIEF
 A. The Present Posture of this Case
 
 66
 In its en banc opinion this Court decided that any award of back pay to which Skehan was otherwise entitled from the College itself was barred by the eleventh amendment. This holding was based on the decision of the Pennsylvania Commonwealth Court in Brungard v. Hartman, 12 Pa.Cmwlth. 477, 315 A.2d 913 (1974), that state colleges are agencies for which Pennsylvania claims sovereign immunity. The College's sovereign immunity status under state law was deemed by this Court to be dispositive of the eleventh amendment immunity issue as well. 538 F.2d at 62.
 
 
 67
 This Court did direct the district court to consider an award of back pay against the individual defendants in this case; the availability of such an award would depend upon each defendant's ability to establish that he acted in good faith and without malice under the official immunity doctrine. The period for which back pay could be awarded was to depend upon the district court's findings as to Skehan's constitutional challenges to his nonrenewal. Thus, this Court directed that "(i)f Skehan's only contract right expired by its terms at the end of the 1970-71 academic year, and there was no first amendment violation, a back pay award . . . covering the 1970-71 period, must be considered." Id. 63. On the other hand, "(i)f either the article 5(e) claim or the first amendment claim should be decided in Skehan's favor, the court should consider the award of back pay to date against the individual defendants, and also prospective reinstatement . . . at least until appropriate college termination procedures have taken place." Id.
 
 
 68
 We also directed that an award of attorney's fees be considered against the individual defendants for bad faith, vexatious, wanton or oppressive conduct either prior to or during the course of this litigation, and against the College for such conduct during this litigation. Subsequent to our en banc opinion, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, and in the proceedings on remand Skehan based his fee request on that statutory provision.
 
 
 69
 The district court was not required to consider the amount of back pay to which Skehan was entitled for the violations of his right to procedural due process with respect to either the nonrenewal or the termination decision because Skehan was not successful in the proceedings below in establishing the liability of any defendant for damages arising from those violations. He was also unsuccessful in his effort to recover attorney's fees because the district court held that sovereign immunity barred a fee recovery from the College, and it exercised its discretion under the Awards Act to deny Skehan an award of fees from the individual defendants. The court did prospectively reinstate Skehan to a suspended with pay status at the College, pending the completion of nonrenewal and termination proceedings. Various aspects of the district court's award of relief and this Court's instructions with respect to that award have been raised as grounds of appeal by the parties here.
 
 B. Sovereign Immunity
 
 70
 In spite of this Court's holding that Bloomsburg State College is an entity of the Commonwealth of Pennsylvania to which sovereign immunity attaches, Skehan asked the district court to consider his claim for monetary relief against the College. In its opinion on the remedial aspects of this case, filed on July 20, 1977, the district court, deeming itself bound by our earlier holding, refused to entertain Skehan's argument that this Court had erred. Skehan v. Board of Trustees of Bloomsburg State College, 436 F.Supp. 657, 665 (M.D.Pa.1977). We, too, are bound by the determination of this Court en banc unless intervening decisions of the Supreme Court, acts of Congress, or changes in applicable state law require us to reconsider our prior holding.
 
 
 71
 Although Skehan was unable to present any arguments based on the effects of intervening law on the sovereign immunity issue to the district court, he argued before this Court that the eleventh amendment immunity of the College has been waived both by the effects of a recent decision of the Pennsylvania Supreme Court and by recent decisions of the United States Supreme Court. We shall consider the effects of this intervening decisional law on our earlier holding that the eleventh amendment bars an award of monetary relief against the College in this case. We do so in the light of the Supreme Court's admonition that " 'an appellate court must apply the law in effect at the time it renders its decision.' " Bradley v. School Board of the City of Richmond, 416 U.S. 696, 714, 94 S.Ct. 2006, 2017, 40 L.Ed.2d 476 (1974), Quoting Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).
 
 1. Intervening State Law
 
 72
 We shall first address Skehan's argument based on changes in the applicable state law. He contends that the decision of the Pennsylvania Supreme Court in Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709 (1978), entered on July 14, 1978, constituted consent by the Commonwealth of Pennsylvania and all its agencies to be sued in federal court.
 
 
 73
 The eleventh amendment has been construed by the Supreme Court not to bar an action in federal court against the state or its officers acting in their official capacities for prospective injunctive relief from unconstitutional state actions. See Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Thus, this Court earlier held that the eleventh amendment presented no impediment to Skehan's request for prospective reinstatement as relief for the constitutional violations he established. 538 F.2d at 63. However, Edelman made it clear that, absent consent to suit by the state, a federal court may not award relief against state officers or agencies that constitutes a compensatory money judgment payable out of the state treasury, even if that relief is labeled as equitable in nature. 415 U.S. at 666, 94 S.Ct. 1347.
 
 
 74
 Skehan does not challenge this Court's earlier holding that his request for a back pay award from the College is the type of retroactive monetary relief proscribed by Edelman ; rather, he contends that the Pennsylvania Supreme Court waived the Commonwealth's immunity to such an award in the Mayle decision. Although it cannot be gainsaid that a state may waive its constitutional protection under the eleventh amendment, See Edelman, supra at 673, 94 S.Ct. 1347, events subsequent to the decision in Mayle make it clear that Pennsylvania has not consented to the imposition of the type of monetary relief sought by Skehan in this case.
 
 
 75
 In Mayle a divided Pennsylvania Supreme Court "abrogated" the doctrine of sovereign immunity, whereby the Commonwealth had previously been immune from liability arising from the torts of its agents except where a legislative act authorized recovery. 479 Pa. at 386, 388 A.2d at 709-10. The court held that sovereign immunity in Pennsylvania was a non-constitutional doctrine that had its origins in judicial decisions, and that neither the state constitution nor legislative enactments precluded the court from abolishing the doctrine it had created and overruling all prior inconsistent opinions. Id. at 402-406, 388 A.2d at 718-20.
 
 
 76
 Skehan argues that although the Mayle opinion did not in terms address the applicability of its holding to the Commonwealth's eleventh amendment immunity from suits for damages in federal court, it should be construed to waive Bloomsburg State's immunity here because the language of Mayle rejects the sovereign immunity doctrine and its justifications in broad terms, and because the opinion relies in part upon the refusal of the Pennsylvania legislature to ratify the eleventh amendment when it was proposed by Congress in 1794. See 479 Pa. at 390, 402, 388 A.2d at 712, 718.
 
 
 77
 The Supreme Court has held that "(i)n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.' " Edelman, supra at 673, 94 S.Ct. at 1360-61, Quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909). This rule has been applied to cases in which a state has consented to suit in its own courts by statute; consent to a similar suit in the federal courts has not been inferred absent a clear declaration in the statutory language that the state intended to waive its eleventh amendment immunity as well as its sovereign immunity under state law. See Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 577, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 465, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 54, 64 S.Ct. 873, 88 L.Ed. 1121 (1944).
 
 
 78
 We would face an apparently novel application of this rule were we required to interpret the effect of a state's abrogation of its state law sovereign immunity by judicial decision on its eleventh amendment immunity from damage actions in federal court. See Greenfield v. Vesella, 457 F.Supp. 316, 319-20 (W.D.Pa.1978) (holding that the decision in Mayle has waived the Commonwealth's eleventh amendment immunity). Recent action by the Pennsylvania legislature has precluded our need to enter this thicket.
 
 
 79
 On September 28, 1978, the Pennsylvania legislature enacted House Bill No. 2437, Act No. 1978-152, reaffirming and preserving sovereign immunity as a bar to claims brought against the Commonwealth and its agencies, officials, and employees. See 1978 Pa.Legis.Serv. 629-36. Section 2 of that Act amends the Judicial Code, Act of July 9, 1976, P.L. 586, Act No. 142, 42 Pa.C.S.A., by adding new sections 5110 and 5111, limiting the scope of the Commonwealth's waiver of sovereign immunity to particular types of actions and limiting recovery to particular types of damages. Section 5(a) of the Act, entitled "Construction and Application," states the legislature's intent that the Act "specifically respond to and prescribe limitations on the decision of Mayle v. Commonwealth . . . ." Moreover, section 5(b)(1) bars any cause of action against the Commonwealth not permitted under 42 Pa.C.S.A. § 5110, regardless of when it arose, unless it would not have been barred by applicable statutory or decisional law prior to the Mayle decision. Finally, section 5(e) provides that "(n)othing contained in this act shall be construed to waive the Commonwealth's immunity from suit in Federal courts guaranteed by the eleventh amendment to the United States Constitution." The Act went into effect on the date of its enactment, September 28, 1978.
 
 
 80
 In enacting the foregoing statutory provision the Pennsylvania legislature has effectively overruled the decision of the Pennsylvania Supreme Court in Mayle. Thus, for Skehan to prevail in his argument that intervening changes in Pennsylvania law require us to disregard the earlier determination of the en banc Court on the sovereign immunity issue he would have to demonstrate that state colleges like Bloomsburg State are no longer deemed to be agencies cloaked with the Commonwealth's sovereign immunity. Nothing in the new sovereign immunity statute suggests such a result and recent decisions of the Pennsylvania Commonwealth Court have reaffirmed the holding of Brungard v. Hartman to the contrary. See Finkelstein v. Shippensburg State College, 29 Pa.Cmwlth. 373, 370 A.2d 1259 (1977); Williams v. West Chester State College, 29 Pa.Cmwlth. 240, 370 A.2d 774 (1977). Our previous ruling that Bloomsburg State College cannot be made liable to Skehan for an award of back pay will not be disturbed on the ground of intervening changes in applicable state law.
 
 
 81
 2. Intervening Decisions of the Supreme Court
 
 
 82
 Skehan also argues that the Supreme Court's holding in Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that local governmental units may be deemed "persons" within the meaning of 42 U.S.C. § 1983 compels the conclusion that § 1983 now must be construed as a valid Congressional waiver of the states' eleventh amendment immunity to suits for damages in federal court. Thus, he requests this Court to make a determination as to the College's status as a "person" liable to an award of damages under § 1983. Because we do not believe that the necessary implication of the Monell decision is an overruling of prior Supreme Court cases holding that § 1983 does not abrogate the states' eleventh amendment sovereign immunity, we find it unnecessary to make the requested finding as to the College's status as a § 1983 "person."
 
 
 83
 In ruling on Skehan's argument here it is necessary to first review recent opinions of the Supreme Court touching upon the legislative authority of Congress to impose upon the states consent to being sued in actions otherwise barred by the eleventh amendment. Parden v. Terminal Railway Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), is the seminal case in this area. There the Supreme Court held that Alabama had consented to a suit for damages under the Federal Employers' Liability Act brought by an employee of a state-owned interstate railroad who had sustained injuries in the scope of his employment. The Court's holding was based on the fact that the F.E.L.A. was a congressional enactment which by its terms authorized suit against a general class of defendants literally including states and state instrumentalities, and the fact that Alabama began to operate an interstate railroad twenty years after the passage of the Act. See Edelman v. Jordan, supra, 415 U.S. at 672, 94 S.Ct. 1347.
 
 
 84
 In Edelman, supra, the Court of Appeals had held that Parden compelled a similar finding of consent to suit waiving the eleventh amendment. There plaintiffs had sued under 42 U.S.C. § 1983 for retroactive payment of welfare benefits allegedly withheld from them by the Illinois Department of Public Aid in violation of applicable federal laws and the equal protection clause. The Court of Appeals held, and three dissenters from the Supreme Court's reversal of that holding agreed, that § 1983 created a private cause of action to enforce the applicable provisions of the Social Security Act, and that the state's participation in the federally assisted welfare program constituted constructive consent to suits challenging the state's failure to comply with the terms of participation in that program. See Edelman v. Jordan, supra at 688-96, 94 S.Ct. 1347 (Marshall & Blackmun, JJ., dissenting); Id. 678-87, 94 S.Ct. 1347 (Douglas, J., dissenting).
 
 
 85
 The Court majority disagreed, however, holding that a federal court's remedial power under § 1983 was limited by the eleventh amendment to awarding prospective injunctive relief against the state, absent "the threshold fact of congressional authorization to sue a class of defendants which literally includes States . . . ." Id. 672, 94 S.Ct. at 1360. Section 1983 was held by the Court not to be such an authorization because it was not deemed to authorize suits against the states themselves but only against state officers. Id. 675-77, 94 S.Ct. 1347.
 
 
 86
 In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court was faced with the question whether the eleventh amendment proscribed Congress' authorization of suits for back pay awards brought by employees against state governmental bodies found to have violated the antidiscrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e Et seq. Congress had amended Title VII to include governmental bodies within the Act's definition of employers through passage of the Equal Employment Opportunity Act of 1972. The Second Circuit had held that insofar as the amendments to Title VII authorized a private action for the recovery of damages against the states they were unconstitutional under the interpretation of the eleventh amendment adopted by the Supreme Court in Edelman.
 
 
 87
 The Supreme Court, in unanimously reversing that judgment, noted that in Fitzpatrick "(o)ur analysis begins where Edelman ended, for in this Title VII case the 'threshold fact of congressional authorization,' . . . to sue the State as employer is clearly present." 427 U.S. at 452, 96 S.Ct. at 2670. The Court reiterated that neither the Social Security Act nor § 1983 had provided that threshold predicate to a finding of eleventh amendment waiver in Edelman. The Court explained that § 1983 had not been read as such an embodiment of congressional intent to abrogate sovereign immunity because "(it) had been held in Monroe v. Pape, 365 U.S. 167, 187-191 (, 81 S.Ct. 473, 5 L.Ed.2d 492) (1961), to exclude cities and other municipal corporations from its ambit; that being the case, It could not have been intended to include States as parties defendant." 427 U.S. at 452, 96 S.Ct. at 2669. (emphasis supplied).
 
 
 88
 Having found the predicate of congressional authorization that was absent in Edelman to be present in Fitzpatrick, the Court went on to hold that Congress' imposition of suit against the states in the Title VII amendments was a valid exercise of its power under § 5 of the fourteenth amendment "to enforce by appropriate legislation, the provisions" of that amendment:
 
 
 89
 (W)e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts. See Edelman v. Jordan, 415 U.S. 651 (, 94 S.Ct. 1347, 39 L.Ed.2d 662) (1974) . . . .
 
 
 90
 427 U.S. at 456, 96 S.Ct. at 2671 (citations and footnote omitted).
 
 
 91
 Significantly, in this context of Congress' exercise of its enforcement powers under § 5 of the fourteenth amendment, the Court did not even discuss the requirement earlier expressed in Parden And Edelman that a valid waiver of the state's eleventh amendment immunity depends upon its consent to congressional authorization of damage actions by private parties against state defendants. See Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States, 126 U.Pa.L.Rev. 1203, 1235-37 (1978).
 
 
 92
 Justices Brennan and Stevens separately concurred in the Court's judgment in Fitzpatrick on grounds not applicable to our discussion here. See 427 U.S. at 457-58, 96 S.Ct. 2666 (Brennan, J., concurring); Id. 458-60, 96 S.Ct. 2666 (Stevens, J., concurring).
 
 
 93
 Skehan's argument is that the Supreme Court's decision in Monell last term, overruling Monroe v. Pape, removed any distinction between Edelman and Fitzpatrick and, in effect, overruled Sub silentio the holding in Edelman that § 1983 was not a congressional authorization of suits against a class of defendants literally including states.
 
 
 94
 We need not review here the Supreme Court's analysis of the legislative history of § 1983 in Monell that led it to its conclusion "that Congress Did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. at 690, 98 S.Ct. at 2035 (footnote omitted; Court's emphasis). However, we should note that the Court also held that "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. (I)n other words, a municipality cannot be held liable under § 1983 on a Respondeat superior theory." Id. at 691, 98 S.Ct. at 2036. Rather, the Court concluded that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694, 98 S.Ct. at 2038.
 
 
 95
 The possible effect of this holding on the eleventh amendment sovereign immunity doctrine was not addressed by the Court; the Monell holding was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes." Id. at 690, n.54, 98 S.Ct. at 2035 n.54. In the case before us today we are confronted with a local government defendant that has been held to share in the eleventh amendment sovereign immunity of the Commonwealth of Pennsylvania. However, Bloomsburg State College's status as a person under § 1983 has not been previously determined by this Court or the district court; up until now subject matter jurisdiction over the College in this case has been affirmed only under the general federal question jurisdiction of 28 U.S.C. § 1331. See 501 F.2d at 44. If we were to accept Skehan's contention that Monell overruled Edelman sub silentio on the question of § 1983's effect on the state's eleventh amendment immunity it might first be necessary to remand this case to the district court with instructions to determine the College's liability as a § 1983 defendant under the guidelines set forth in Monell. See Norris v. Frame, 585 F.2d 1183, 1186 n.8 (3d Cir. 1978).
 
 
 96
 Such a remand is unnecessary in this case because, absent a much clearer statement by the Supreme Court to the effect that § 1983 must now be construed as waiving the states' sovereign immunity from awards of monetary damages, this Court considers itself bound by the holding of Edelman to the contrary. We note that of the present members of the Supreme Court, Justice Brennan has expressed his view that it is at least an open question whether Edelman has been overruled by Monell. See Hutto v. Finney, 437 U.S. 678, 700 - 704, 98 S.Ct. 2565, 2579-81 (1978) (Brennan, J., concurring). Justice Powell, joined by the Chief Justice and Justices White and Rehnquist, has argued, to the contrary, that the vitality of the Edelman holding has not been undermined Sub silentio by Fitzpatrick And Monell. See id. 708 n.6, 98 S.Ct. at 2583 n.6 (Powell, J., concurring in part and dissenting in part). Thus, the conclusion that Edelman is no longer good law is certainly not an inescapable one. We feel that it would be inappropriate for this Court to hold that Edelman has been overruled by Monell, an opinion issued only four years later, when such a result was not even intimated by the authors of the majority, concurring and dissenting opinions in Monell. We conclude that Skehan's argument that the College's sovereign immunity has been waived by the congressional imposition of suits upon the states in § 1983 is precluded by the Supreme Court's opinion in Edelman v. Jordan.
 
 
 97
 Thus, our prior determination that Skehan is not entitled to a back pay award against the College because of its status as an agency of the Commonwealth to which eleventh amendment sovereign immunity attaches will not be disturbed.
 
 C. Official Immunity
 
 98
 On remand from this Court the district court heard additional testimony on the question of the defendants' good faith in failing to comply with Skehan's request for an Article 5e hearing and in terminating his employment with the College without a prior hearing. See Part I, B Supra. That the defendants violated procedural due process with respect to Article 5e has today been affirmed by this Court, See Part II Supra ; we earlier affirmed that the defendants violated procedural due process by terminating Skehan's employment during the term of his contract without a prior hearing, See 501 F.2d at 38.
 
 
 99
 In its opinion issued on May 18, 1977, the district court concluded, based on its findings of fact, that defendant Nossen's actions with respect to both violations of procedural due process established by Skehan had been taken in good faith and without malicious intention. The court also concluded that he had acted in a reasonable manner and had not violated clearly established constitutional rights with respect to either denial of due process. 431 F.Supp. at 1391. In its later opinion, entered on July 20, 1977, the court stated that the only individual defendant from whom Skehan had sought monetary damages was President Nossen, and because he and the College were both immune from liability, the court was unable to award Skehan any relief in the nature of back pay. 436 F.Supp. at 659. Skehan challenges both the district court's refusal to address the question of the liability of each individual defendant in this case, and its findings and conclusions with respect to Nossen's immunity from liability.
 
 
 100
 Language in this Court's en banc opinion indicated our belief that the district court would be required to consider the availability of the official immunity defense to each of the individual defendants. For example, we stated:
 
 
 101
 The district court will be required to inquire into the status and responsibility of each individual defendant and to determine whether, for example, a trustee should be held responsible for the same level of knowledge of constitutional rights as a college president or a commissioner of education. The determination may turn on the relative availability to each defendant of counsel, as well as the relative certainty of the legal issue, a criterion to which the Wood v. Strickland Court expressly adverted.
 
 
 102
 538 F.2d at 62. In the concluding section of our opinion, summarizing the directions to the district court on remand, we included an instruction that "(t)he court should then make findings of fact with respect to the immunity of each defendant in conformance with this opinion." Id. 63.
 
 
 103
 Of course, if the district court was correct in its conclusion that Skehan was only seeking monetary damages from one of the individual defendants, then this Court's assumption to the contrary could not alter that fact.
 
 
 104
 On December 1, 1976, the district court issued an order reducing to writing certain agreements made between the parties at a pre-trial conference held that day. Within that order the court stated: "The parties stipulated at the final pre-trial conference that the Defendants Pittenger and Carlson are not liable to the Plaintiff for damages." Skehan has not presented any challenge to the accuracy of that statement, nor any reason why that stipulation should not be binding. Thus, there was no error in the district court's failure to consider the applicability of the official immunity defense to defendants Pittenger and Carlson.
 
 
 105
 Skehan did not name the individual members of the College's Board of Trustees as defendants in his complaint. In his description of the parties therein he identified the defendant Board of Trustees as "the official supervisory body of defendant, Bloomsburg State College." On December 1, 1976, Skehan filed a motion with the district court for leave to file an amendment to his complaint adding the names of the individual members of the Board to the list of parties defendant. The district court denied that motion in an order dated December 23, 1976, and Skehan challenges that order.
 
 
 106
 The district court held that Skehan's assumption that the individual trustees had already been made parties to this suit, and the fact that they had been made aware of its institution and progress to date, did not override the requirement that they be properly served as parties defendant under Rule 4 of the Federal Rules of Civil Procedure. In ruling on Skehan's motion, the court did not reach the question whether the requested amendment would be barred by the statute of limitations, or whether it might "relate back" to the date of the original complaint under Rule 15(c) of the Federal Rules of Civil Procedure. Rather, the sole basis of its decision denying Skehan's motion was that "justice requires that the amendment not be allowed at this stage of the proceedings," given that the trustees had not been previously informed that they were subject to individual liability, that portions of the case had already been decided on the merits and that trial on the remaining portions was about to commence.
 
 
 107
 Skehan contends that the district court abused its discretion in denying his motion to add the trustees as defendants. He argues that basic fairness required the court to grant his motion because he was not made aware that he would have to name the trustees as individuals in order to obtain back pay until this Court raised the issue of the College's possible sovereign immunity in its panel opinion entered on May 3, 1974. See 501 F.2d at 41-43.
 
 
 108
 Like a motion to reopen the record for the taking of additional testimony, See Part I, B Supra, a Rule 15(a) motion for leave to amend the pleadings is within the sound discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Although district courts are required to allow amendments freely under the terms of the Rule, certain factors, such as undue prejudice to the other party and undue delay by the movant, have been found to establish sufficient justification for the denial of such motions. See 3 Moore's Federal Practice P 15.08(4) at 91-94 (2d ed. 1978). Here, the district court found that the trustees would be prejudiced by their addition as parties defendant in their individual capacities because they had not been participants in the proceedings that established Skehan's right to recovery on the pretermination hearing claim. Moreover, Skehan's motion was not filed until a short time prior to the scheduled date of trial on his remaining substantive claims. In light of the district court's careful consideration of these factors we cannot find the court's denial of Skehan's motion for leave to add the individual members of the Board of Trustees as named defendants in his complaint to have been contrary to the sound exercise of its discretion.
 
 
 109
 Thus, the district court was correct in its assertion that Skehan had sought monetary damages from only one of the individual defendants properly served as a party to this action. The earlier assumption of this Court to the contrary cannot alter that fact, and, therefore, there was no error in the court's failure to consider the applicability of the official immunity defense to any defendant other than President Nossen.
 
 
 110
 This Court directed the district court to make findings concerning "whether the defendants met their burden of establishing (1) that they did not know and reasonably need not have known that depriving Skehan of a pretermination hearing violated due process, and (2) that they acted without malicious intention to deprive him of his constitutional rights or cause him to suffer other injury." 538 F.2d at 62. Similar findings were to be made if the district court found for Skehan on his Article 5e claim. Id. 63. After hearing testimony on this issue the district court concluded that defendant Nossen had met his burden of proving both elements of the official immunity test, as set forth by the Supreme Court in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The court fully set forth the factual findings it relied upon in reaching those conclusions.
 
 
 111
 Our review of the record does not support Skehan's contention that the district court's factual findings should be set aside as clearly erroneous. In reviewing those findings we must credit the district court's evaluation of the testimony, and that testimony clearly supports the court's findings that President Nossen did not act with malicious intent or in knowing violation of Skehan's constitutional rights in failing to provide him with either the procedures set forth in Article 5e or a hearing prior to his termination.
 
 
 112
 Additionally, we agree with the district court that at the time these events occurred in the Fall of 1970, defendant Nossen did not have reason to know that his actions would later be held to have violated Skehan's constitutional rights. As the district court pointed out, quoting an opinion of the Seventh Circuit, "The first definitive holding that a termination of teachers' property interests in their employment contracts with state institutions required due process hearings was Board of Regents of State Colleges v. Roth, (408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972))." 431 F.Supp. at 1391, Quoting Hostrop v. Board of Junior College District No. 515, 523 F.2d 569, 578 (7th Cir. 1975), Cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976). The first definitive holding that Skehan was contractually entitled, under Pennsylvania law, to the provisions of Article 5e, and that the College's failure to afford him those procedures violated due process, was the district court's opinion in this case on the 5e issue. Paraphrasing the Supreme Court's opinion in Wood v. Strickland, supra, 420 U.S. at 321, 95 S.Ct. 992, we cannot say that President Nossen acted in "ignorance or disregard of settled, indisputable law" when he terminated Skehan's employment with the College without a prior hearing and without having acted upon his request for an Article 5e hearing.
 
 
 113
 We agree with the district court's findings and conclusions that defendant Nossen established by a preponderance of the evidence that he was entitled to an official immunity defense from Skehan's claims for monetary damages arising from either his dismissal from the College without a prior hearing or his failure to receive the academic freedom hearing set forth in Article 5e.[3]
 
 D. Injunctive Relief
 
 114
 The district court issued a final order, unchallenged, and indeed supported, by the defendants, granting Skehan the following injunctive relief: he was reinstated to the suspended with pay status he held at the College on October 15, 1970; the College was ordered to recreate for his case the procedures of Article 5e; a reconstituted Committee on Professional Affairs was to conduct the initial investigation of Skehan's allegation that his nonrenewal resulted from considerations violative of his academic freedom; deadlines were established for each stage of the nonrenewal proceedings set out in Article 5e and Article 9, See note 1 Supra ; and, following a final decision on Skehan's renewal or nonrenewal, the President of the College was given the option of holding a pretermination hearing within 30 days failure to hold that hearing within the stated time would result in Skehan's full reinstatement as a faculty member of the College. 436 F.Supp. at 668-69.
 
 
 115
 Skehan contends that he should have been fully reinstated as a faculty member of the College pending the appropriate proceedings. In spite of his assertion to the contrary, nothing in this Court's prior opinions in this case required the district court to order Skehan fully reinstated to the position he held at the time prior to his suspension from teaching responsibilities. Rather, in our opinion en banc this Court directed that the district court should consider prospective reinstatement as a remedy for the College's violation of Skehan's right to the procedures set forth in Article 5e "at least until appropriate college termination procedures have taken place." 538 F.2d at 63. We did not instruct the district court that it had to award Skehan prospective reinstatement as a remedy for the 5e violation, nor did we define the terms of such reinstatement with particularity.
 
 
 116
 The district court determined that Skehan's reinstatement to the suspended with pay status he held prior to his termination from the College's employment on October 19, 1970, was a grant of equitable relief appropriate to this case. We believe that the court's order minimized the disruptive effects that would have resulted at the College had it required the administration to provide classes for Skehan to teach pending the results of the mandated hearing proceedings. Additional disruption of scheduling would have occurred had the College altered its teaching assignments to accommodate Skehan's reinstatement only to determine some months later that its earlier decision to terminate Skehan's employment as a faculty member was to be reaffirmed.
 
 
 117
 On the other hand, the court's order enabled Skehan to return to the College's payroll pending the proceedings to which he was entitled and, thus, he was not "unduly limited in his ability to pursue the hearing remedy."436 F.Supp. at 664. We believe that the relief afforded by the district court presented an equitable accommodation of the interests of both the College and Dr. Skehan. Noting the admonition of the Supreme Court that, "(i)n shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow," Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973), we hold that the district court's failure to order the College to provide Skehan with teaching responsibilities pending his Article 5e and pretermination hearings did not constitute an abuse of discretion.
 
 
 118
 Skehan has apprised this Court of proceedings that have taken place at the College subsequent to the district court's order reinstating him to a suspended status. He argues that this Court should fully reinstate him to his former position at Bloomsburg State because the College did not comply with that aspect of the district court's order mandating his full reinstatement if no pretermination hearing were held within 30 days of a final decision on the question of his renewal or nonrenewal. We believe that any questions concerning the College's compliance with the district court's final order of July 20, 1977, should be addressed to that court in the first instance. Thus, we shall deny the motion filed by Skehan in this Court for leave to file a supplemental appendix detailing events that have transpired at the College subsequent to the district court's order.
 
 E. Attorney's Fees
 
 119
 During the proceedings below Skehan based his claim for an award of attorney's fees on the provisions of the Civil Rights Attorney's Fees Awards Act of 1976,[4] which had been enacted subsequent to this Court's en banc opinion. The district court made factual findings, unchallenged here, that would preclude a fee award based on the alternative grounds of the defendants' bad faith either in the prelitigation stages of this case or in the pursuit of their defense. See 436 F.Supp. at 663. The court also denied Skehan's request for attorney's fees under the provisions of the Awards Act. Skehan's challenge to this aspect of the district court's order is governed by the opinion of the Supreme Court in Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565 (1978).
 
 
 120
 The district court's ruling denying Skehan's request for attorney's fees under the Awards Act from either defendant Nossen or from the College was multifaceted.
 
 
 121
 First, the court held that defendant Nossen was not personally liable for such an award because Skehan was not a "prevailing party" vis a vis Nossen. This followed from the fact that Nossen had established immunity to Skehan's claim for damages. 436 F.Supp. at 665. Even if Nossen's successful official immunity defense could not be viewed as preventing Skehan from characterizing himself as a prevailing party, the court held that it would have denied Skehan's request for fees from Nossen as an exercise of its discretion under the Act. The court stated that an award of fees against Nossen in his individual capacity would be grossly unjust, and would tend to "severely undermine the policies which motivated the Supreme Court to fashion (the official immunity) defense." Id. 665-66.
 
 
 122
 The Supreme Court, in its opinion in Hutto v. Finney, stated that, absent a finding that individual defendants had litigated in bad faith, they would not be held liable to a fee award under the Awards Act. 437 U.S. at 700, 98 S.Ct. at 2579. Thus, the district court's refusal to award fees to Skehan against defendant Nossen in his individual capacity could be affirmed on the basis of the court's factual finding that the defendants in this case had not pursued their defense in bad faith. Moreover, language in the Hutto opinion also suggests that the district court soundly exercised its discretion in refusing to award fees against a defendant who had been deemed immune from liability for damages under the official immunity doctrine. In a footnote disputing the dissenters' suggestion that the Awards Act should be construed to provide for fee awards only against individual defendants, the Hutto majority stated:
 
 
 123
 This is manifestly unfair when, as here, the individual officers have no personal interest in the conduct of the State's litigation, and it defies this Court's insistence in a related context that imposing personal liability in the absence of bad faith may cause state officers to "exercise their discretion with undue timidity." Wood v. Strickland, 420 U.S. 308, 321 (, 95 S.Ct. 992, 43 L.Ed.2d 214) . . . .
 
 
 124
 Id. at 699, n.32, 98 S.Ct. at 2578, n.32 (citation omitted).
 
 
 125
 The Supreme Court's opinion in Hutto is dispositive of Skehan's challenge to the district court's refusal to grant an award of attorney's fees against Nossen. That refusal must be viewed as a valid exercise of the court's discretion under the Act, given its previous determinations that Nossen was officially immune from damage liability and that he had not pursued his defense in bad faith.
 
 
 126
 The district court also held, however, that Skehan was not entitled to a fee award against the defendants in their official capacities. The Court stated that "(i)n the absence of explicit statutory language (in the Awards Act) subjecting the states to liability for damages and attorney's fees, this Court will not imply a limit to the state's immunity to suit under the Eleventh Amendment." 436 F.Supp. at 667. Thus, the court held that Skehan was constitutionally barred from recovery of a fee award against the College. The Supreme Court's opinion in Hutto requires us to reverse that holding.
 
 
 127
 In Hutto the Court held that under the Awards Act fees may be recovered from governmental entities otherwise entitled to immunity under the eleventh amendment. This holding was based on the Act's legislative history, clearly indicating Congress' intent to allow recovery of attorney's fees from the states or local governments, and on the fact that attorney's fees "as a part of the costs" have traditionally been awarded without regard for the states' sovereign immunity. 437 U.S. at 692 - 700, 98 S.Ct. at 2575-79. The Court also made clear that the Awards Act applies to cases, such as this one, that were pending on the date of its enactment. Id. at ----, n.23, 98 S.Ct. at 2576, n.23. See generally Bradley v. School Board of City of Richmond, 416 U.S. 696, 710-11 & n.14, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Moreover, the Court held that whether or not state agencies are named as defendants in a § 1983 action, the Awards Act contemplates that the prevailing plaintiff may recover fees from the individual defendants in their official capacities or directly from the state agencies. 437 U.S. at 699-700, 98 S.Ct. at 2578-79. Thus, the district court need not determine whether the College is a person subject to liability under § 1983 in order to grant Skehan's request for attorney's fees from the College. See Part III, B, 2 Supra.
 
 
 128
 The Hutto opinion necessitates that we remand this case to the district court for consideration of an award of attorney's fees to Skehan from the College under 42 U.S.C. § 1988. The district court suggested in its opinion on the attorney's fees aspect of this case that even if the eleventh amendment did not bar a recovery of fees from the College, the court, in its discretion, would only have awarded fees to Skehan for time expended on the Article 5e claim. There is no need for us to rule on that suggestion at this time. Nonetheless, we refer the district court to the legislative history of the Awards Act, which offers some guidance as to Congress' intent with respect to the standards governing the discretion of district courts in making fee awards. The Senate Report accompanying the Act states:
 
 
 129
 It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the statutes covered by (§ 1988), if successful, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 (, 88 S.Ct. 964, 19 L.Ed.2d 1263) (1968).
 
 
 130
 S.Rep.No. 94-1011, 94th Cong., 2d Sess. 4, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 5908, 5912 (footnote omitted).
 
 
 131
 The computation of an appropriate fee award in this case should, of course, conform to the general standards formulated by this Court in prior opinions. See Hughes v. Repko, 578 F.2d 483 (3d Cir. 1978).
 
 F. Costs
 
 132
 Skehan's final ground for appeal questions the district court's award of court costs. In its final opinion the district court stated that, "(b)ecause each party was at fault in this case, it seems appropriate that each party shall bear his own costs." 436 F.Supp. at 667. In its original opinion on the merits of this case, entered on May 9, 1973, the district court stated that "the Clerk will be directed to enter judgment in favor of the Plaintiff . . . together with costs." 358 F.Supp. at 436. We shall assume that Skehan's entitlement to costs connected with the earlier proceedings in the district court, which were taxed against defendants on June 4, 1973, was not meant to be rescinded by the district court's order directing that each party bear his own costs with respect to the proceedings after remand. Given that assumption, we find no basis to alter the district court's determination as to costs.
 
 IV. CONCLUSION
 
 133
 We shall deny defendants' motion to dismiss Skehan's appeal or, alternatively, to strike his brief and appendix and to require that they be refiled.
 
 
 134
 The judgment of the district court will be affirmed, except that the case will be remanded to the district court for consideration of an award of attorney's fees to plaintiff Skehan against the defendants in their official capacities, pursuant to the Civil Rights Attorney's Fees Awards Act of 1976.
 
 
 135
 Each party shall bear his own costs with respect to this appeal and cross-appeal.
 
 
 
 *
 The Honorable Frederick B. Lacey, United States District Court Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College went into effect on September 1, 1968. It has since been superseded by a collective bargaining agreement, but was in effect during the entire period of Skehan's dispute with the College. Article 5e provided:
 If a faculty member's service to the College is to be terminated during the first two years of the probationary (pretenure) period, the President of the College will feel free to explain to the faculty member the basis of the decision, but he shall not be required to do so except in a situation where there is an allegation of infringement of academic freedom. If a faculty member of professorial rank, on probationary appointment, alleges that a decision not to reappoint him has been caused by considerations violative of academic freedom, his allegation shall be given preliminary consideration by the Committee on Professional Affairs, and the procedures concerning notification, appeal, hearing, and defense outlined in # 9 of this document will be followed.
 Article 9 of the Statement, referred to in Article 5e, set out the formal procedures applicable to the dismissal of a tenured faculty member.
 
 
 [2]
 We note that Pennsylvania has recently revised its statutes of limitations through the enactment of the Judicial Code. See Act of July 9, 1976, P.L. 586, Act No. 142, § 2, 42 Pa.C.S.A. §§ 5501-5574 (Purdon's 1977 Supp.). The new codification went into general effect on June 27, 1978; however, the newly enacted periods of limitation have no effect on an action such as this one that was already pending on the effective date of repeal. See Act of July 9, 1976, P.L. 586, Act. No. 142, § 25(a)
 
 
 [3]
 Because we have affirmed the determination that neither the College nor any of the individual defendants are liable to Skehan for a back pay award, we need not consider the defendants' argument that the earlier directions of this Court concerning the appropriate amount of such an award, See 538 F.2d at 63; Part III, A Supra, must be reconsidered in light of the Supreme Court's intervening decision in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)
 
 
 [4]
 The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94-559, 90 Stat. 2641, Amending 42 U.S.C. § 1988, was enacted on October 19, 1976. It provides:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.