Jacob THOMPSON, Geralda Thompson, Delia Waterman, Alex La France, Barbara La France, Donald Jacobs, Winnifred Jacobs, Arlene Hill, Richard Grey, Patrick Rommevaux, Wanda Rommevaux, James W. Hill, Nancy Hill, Vern Jones, Katherine Jones, Frank Square, Judity Square, Lori Grey, Plaintiffs,

v.

STATE OF NEW YORK; New York State Police; William G. Connelie, Supt.; County of Madison; Madison County Sheriff's Department; Robert P. Cordary, Sheriff; City of Oneida; Herbert Brewer, Mayor; City of Oneida Police Department; Ellsworth Yemen, Chief of Police; City of Oneida Fire Department; John F. Myers, Fire Chief; Oneida Warrior Society; Duane Markwiecz; Raymond Halbritter; David Honyoust; Duane Hill; Lyman John; Barney Halbritter; Elwood Falconburg; Linda Hill; Gloria Halbritter; Mary Shenandoah; Joe Doe; Richard Roe; James Poe; Louis Markwiecz, Defendants.

No. 77–CV–278.

United States District Court,
N. D. New York.

Dec. 13, 1979.

Bruce O. Jacobs, Syracuse, N. Y., for plaintiffs.

William L. Burke, Hamilton, N. Y., for defendants, County of Madison, Madison Co. Sheriff's Dept. and Robert Cordary, Sheriff.

Frederic N. Rann, Oneida, N. Y., for defendant, City of Oneida.

**MEMORANDUM–DECISION
AND ORDER**

MUNSON, District Judge.

This is a civil rights action brought by plaintiff residents of the Oneida Indian Reservation seeking damages for harm allegedly caused when defendant City, County, and State governments, agencies, and officials, at the behest of defendant Oneida Warrior Society, withdrew police and fire protection from the Oneida Indian Reservation. Presently before the Court are motions by defendants to dismiss plaintiffs' amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for its failure to state a claim upon which relief can be granted.[1]

### I. Facts and Allegations

While the facts alleged in the amended complaint are sketchy,[2] it appears that plaintiffs are members of the Oneida Indian Reservation and residents of Onondaga County, New York. Plaintiffs assert that sometime in the month of October, 1975, members of the defendant Oneida Warrior Society met with the City of Oneida, and as a result of that meeting, the Oneida Police and Fire Departments withdrew their services from the Oneida Reservation. Soon thereafter, the New York State Police and Madison County Sheriff's Department also withdrew their police services.[3]

Plaintiffs' claims have one common thread—that is, whether plaintiffs' civil rights under 25 U.S.C. § 1302, 42 U.S.C. §§ 1983, 1985, and 1986[4] were violated

---

1. All defendants, except for the Oneida Warrior Society, have moved to dismiss plaintiffs' complaint.

2. Despite the weaknesses of plaintiffs' complaint, as a general rule, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

3. When the Court refers to defendants in this action, it means to exclude the Oneida Warrior Society and its members unless indicated to the contrary.

Also named in this lawsuit are three police officers whom plaintiffs designate as Joe Doe, Richard Roe, and James Poe. It would seem that plaintiffs have not served these officers and therefore they are dismissed from this action.

4. Plaintiffs claim that as a result of defendants' conduct, including that of the Oneida Warrior Society and its members, plaintiffs were discriminated against on the basis of race, and they suffered damages in the form of loss of education, employment, funds from various federal programs, and relocation costs amounting to $27,000,000.00.

when defendants withdrew police and fire protection from the Oneida Indian Reservation. Defendants move to dismiss these claims on the grounds that the federal government—not the defendant City, County, and State governments—is responsible for both the operation of the Oneida Indian Reservation and the protection of plaintiffs' civil rights. Alternatively, defendants cite the case of *Chase v. McMasters*, 405 F.Supp. 1297 (N.Dak., 1975), for the tenant that the various defendants have every right to refuse to provide normal government services, such as police and fire protection, to those who do not pay for them. In denying these services to plaintiffs, defendants say they did so within their discretionary authority, which they claim was exercised in a proper manner. The government and government agency defendants also contend that they are not "person[s]" within the meaning of Section 1983. Finally, defendants maintain that the Section 1986 claim is time barred because it was brought more than one year after the alleged cause of action arose.

## II. Plaintiffs' Claim Under Section 1983

### A. The Amenability of Indians to Sue and Be Sued Under Section 1983

■ It is well established in the law that "Indian Tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). Because their status as separate sovereigns predates the Constitution, the Indians have been historically treated as unrestrained by Constitutional provisions designed to limit federal or state authority; *id.* at 56, 98 S.Ct. at 1676. In *Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed.2d 196 (1896), for example, the Supreme Court held that the Fifth Amendment did not operate upon the powers of local self-government enjoyed by the Indian Tribes; *id.* at 384, 16 S.Ct. at 989. Lower federal courts have extended the Supreme Court's holding in *Talton* to other provisions in the Bill of Rights, and to the Fourteenth

Amendment. *See e. g., Native American Church v. Navajo Tribal Council*, 272 F.2d 131 (10th Cir. 1959) (freedom of religion under the First and Fourteenth Amendments).

Although *Talton* and its progeny have exempted Indian Tribes from Constitutional provisions aimed at limiting the powers of federal and state governments, it does not in any way limit the rights of individual Indians to sue the government under the United States Constitutional Amendments or federal civil rights statutes such as Section 1983. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 n.7, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978); F. Cohn, *Handbook of Federal Indian Law*, 179 (1945). Likewise, the *Talton* line of authority would not limit the amenability of individual Indians to be sued.[5]

■ With this background in mind, it is necessary to again examine the language of Section 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, the Indian defendant members of the Oneida Warrior Society are included by Section 1983's coverage of "[e]very person," and the Indian plaintiffs are protected by Section 1983 because they are each a "person within the jurisdiction" of the United States.

The Court now turns to the question of whether plaintiffs have stated a cognizable claim under Section 1983.

### B. The Merits of Plaintiffs' Claim Under Section 1983

■ As stated by the Supreme Court in *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct.

---

**5.** This same reasoning is applicable to plaintiffs' claim under 42 U.S.C. § 1985 and § 1986.

2689, 2692, 61 L.Ed.2d 433 (1979), "The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the constitution and laws.'" The Court went on to hold in *Baker* that Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. "Remedy for this latter type of injury must be sought in state court under traditional tort-law principles." *Id.* 99 S.Ct. at 2695–96. However, since Section 1983 is a remedy for Constitutional torts, an examination of plaintiffs' claim under New York tort law is a useful point of departure for determining whether it is cognizable under Section 1983.

Traditionally under New York tort law a municipality cannot be held liable for a mere failure to furnish adequate police or fire protection to persons for whom it has not assumed a special duty; *Florence v. Goldberg,* 44 N.Y.2d 189, 195, 404 N.Y. S.2d 583, 586, 375 N.E.2d 763, 767 (1978). For a municipality to be held accountable for a special duty, it must have a special relationship with the plaintiff that would create a duty which, if negligently performed, would render that municipality liable. This special duty would exist, for example, where the municipality assumes a duty towards a particular person or class of persons, though it was not required to do so. Thus, to quote Chief Judge Cardozo:

> [I]f conduct has gone forward to such a stage that in action would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward.

*Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 167, 159 N.E. 896, 898 (1978).

In the present case, plaintiffs assert that defendants, after voluntarily providing police and fire protection and creating a special duty, breached that duty by withdrawing police and fire protection from the Oneida Indian Reservation. Unfortunately, plaintiffs' complaint does not specifically allege how defendants' conduct, tortious though it may be, also implicated plaintiffs' Constitutional rights, and the proscriptions of Section 1983. Nevertheless, pursuant to Rule 8(f) of the F.R.C.P., the Court is obliged to construe pleadings "as to do substantial justice." Upon viewing plaintiffs' complaint in this light, it is apparently plaintiffs' contention that they were denied police and fire protection either as a result of being a member of the Oneida Indian Tribe, relatives of the members, or residents of the Oneida Indian Reservation. As such, the complaint infers a violation of plaintiffs' right to the equal protection of the laws, as guaranteed by the Constitution and Section 1983.[6]

In sum, plaintiffs have sufficiently stated a claim under Section 1983 to get them over the hurdle of a Rule 12(b)(6) motion to dismiss. The next issue to be examined is whether defendants are properly named parties under Section 1983.

**C. Defendants as Parties Under Section 1983**

In their Section 1983 claim, plaintiffs have named as defendants: the State of New York; the New York State Police Department; the Superintendent of that Police Department, William G. Connelie, in his official and individual capacities; the County of Madison; the Madison County Sheriff's Department; the Sheriff of Madison County, Robert P. Cordary, in his official and individual capacity; the City of Oneida; the Mayor of Oneida, Herbert Brewer, in his official and individual capacities; the City of Oneida Police and Fire Departments; the Chiefs of those Departments, Ellsworth Yemen and John F.

---

**6.** Defendants contend that based on the case of *Chase v. McMasters,* 405 F.Supp. 1297 (D.N. Dak.1975), a municipality need not provide services under Section 1983 to anyone who does not pay for them. This argument is unpersuasive in the instant case. The question presently being considered is whether the government can tortiously withdraw police and fire protection from Indians when motivated by racial animus. In any event; the Eighth Circuit Court of Appeals has found that the District Court in *Chase* was in error on this issue. 573 F.2d 1011, 1017 (8th Cir.), *cert. denied,* 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978).

Myers; and a private organization, the Oneida Warrior Society, and its members.[7] Defendants argue that none of them are "person[s]" within the meaning of Section 1983, with the exception of the officials named in their individual capacities, and that plaintiffs' complaint must be dismissed. The Court will first address the issue of the state as a "person" within the meaning of Section 1983.

Section 1983, while scarce on settled principles, has stimulated what now amounts to a wealth of court decisions, both in number and diversity. The volume and diversity of cases reflect the extent and multifaceted nature of the government's involvement in the lives of its citizenry, how often that involvement tends to result in unconstitutional state action, and the necessity of a remedy for such conduct.

It is no coincidence that it was a similar pattern of unconstitutional conduct that led to the post-Civil War movement to eradicate the oppressive tendencies of government—especially state government. This reformist movement produced federal civil rights legislation in the form of the Civil Rights Act of 1866[8] and 1871,[9] the latter of which is now codified as 42 U.S.C. § 1983. More significantly, the Fourteenth Amendment of the Constitution was ratified by the States during this period, to further elevate the principles of the Act of 1866 as a part of the fundamental law of the land.[10] In fact, Section 1983 was enacted pursuant to Section 5 of the Fourteenth Amendment, to fully enforce the constitutional form of the Act of 1866, or Section 1 of the Amendment.[11] It is plain, moreover, from the face of Section 1 that its prohibitions are directed at the States themselves. This being the case, it is reasonable to assume that since Section 1983 was enacted to enforce the Fourteenth Amendment, it was designed to remedy the unconstitutional indiscretions of the State.

A recent Supreme Court decision, however, has concluded otherwise. In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the Court held that Congress, in enacting Section 1983, had not intended that it be used as a remedial device against unconstitutional acts by the States themselves. *Id.* 99 S.Ct. at 1147. Unless Congress should decide to change the effect of the holding of *Quern*, victims of the unconstitutional conduct of the States will remain foreclosed from any monetary or retrospective injunctive relief. But what is also important about the Court's ruling is that, because Section 1983 works in conjunction with the Fourteenth Amendment, the Court's narrow reading of Section 1983 is ultimately a limitation on the Fourteenth Amendment itself. In this sense, the *Quern* decision partially deprives litigants of the protective wisdom of the principles of the Fourteenth Amendment, which expresses a fundamental distrust of the unwieldly nature of government. However, as the following examination will detail, the *Quern* decision is not the first time that the Court has taken a circumscribed view of the Fourteenth Amendment or the post-Civil War Civil Rights Acts.

After the Civil War, Congress enacted a series of Civil Rights Statutes to outlaw the Black Codes passed by the Southern States

---

7. The named defendant members of the Oneida Warrior Society are Raymond Halbritter, David Honyoust, Duane Hill, Lyman John, Barney Halbritter, Elwood Falconburg, Linda Hill, Gloria Halbritter, Mary Shenandoah, and Duane and Louis Markwiecz.

8. 14 Stat. 27 (April 9, 1866). *See generally*, Flack, The Adoption of the Fourteenth Amendment (1965) [hereinafter cited as Flack]. The purpose of the Act was to guarantee blacks citizenship, the equal protection of the laws and the same rights as white citizens. Its most controversial provisions declare it the duty of the President to provide military protection and

jurisdiction over all cases where any of the civil rights or immunities belonging to. white persons are denied to citizens by local custom or law on account of race or color.

9. 17 Stat. 13 (April 20, 1871). *See* discussion of the legislative history, *infra*.

10. *See* discussion of the events surrounding the adoption of the Fourteenth Amendment, *infra*.

11. *See* comments of Representative Edmonds quoted at p. 13, *infra; See also* 17 Stat. 13, the original form of Section 1983.

in an effort to reverse the civil rights gains of blacks resulting from the ratification of the Thirteenth Amendment.[12] Included in these Acts was the Civil Rights Act of 1866,[13] which declared that all person born within the United States are guaranteed citizenship and the same rights enjoyed by white citizens, inter alia, to make and enforce contracts, to sue and be sued, inherit, purchase or sell real property, and enjoy the full and equal protection of the laws. Although enacted under the Thirteenth Amendment, the Civil Rights Act of 1866 was of questionable constitutionality because the protection of civil rights had been traditionally reserved to the States.[14] Yet, so profound was the Nation's concern over the unconstitutional conduct of the States towards blacks, that many Congressmen voted in favor of the Civil Rights Act of 1866, even over President Andrew Johnson's veto, and in spite of their belief that it was of doubtful constitutionality.[15]

Still, doubts about the constitutionality of the Act persisted as did the opinion of many people that the principles it embodied ought to become the fundamental law of the land.[16] This led eventually to the proposed Fourteenth Constitutional Amendment being reported out of the House of Representatives to clarify the intent of the Constitution with respect to the civil rights of all citizens. In terms of its content, Section 1 of the Amendment reported was so similar to the Act of 1866 that most Representatives believed the proposed Amendment had merely incorporated the Act of 1866.[17] Also of importance was Section 5 of the Amendment which granted Congress the power to enact affirmative legislation to enforce the other Sections.

For those members of Congress who believed that the principles of the Civil Rights Bill of 1866 should be placed beyond the power of Congress to repeal, the proposed Amendment was a welcomed addition. To others, however, the Amendment signaled a radical and undesired reorientation in the relationship among the federal and state governments and the people. Representative Rogers forthrightly expressed the sentiments of those opposed to the Constitutional Amendment:

> The first section of this programme of disunion is the most dangerous to liberty.
>
> Had the people of the several states, or any of them, required changes in their constitutions; had they required additional safeguards to liberty from the apprehended encroachments of their particular governments; the remedy was in their own hands, and could have been applied by themselves. . . . Had the framers of these amendments intended them to be limitations on the powers of the state governments, they would have imitated the framers of the original constitution, and have expressed that intention. Had congress engaged in the extraordinary occupation of improving the constitutions of the several states, by affording the people additional protection from the exercise of power by their own governments, in matters which concerned themselves alone, they would have declared this purpose in plain and intelligible language.
>
> *Id.* at 32 U.S. 249–50, (7 Pet.) 158.
>
> In proposing the ratification of the Fourteenth Amendment, Representative Bingham said that he acted on Mr. Justice Marshall's suggestion and expressed the intent in the Congressional debates that the Amendment act as a limit on the power of the States.

12. *See generally*, 12 R. Carr, Federal Protection of Civil Rights: Quest for a Sword (1947).

13. 14 Stat. 27 (April 9, 1966).

14. *See* comments of the various Representatives of the 42nd Congress in Flack, *supra* note 7, at 14–45.

15. *Id.*

16. *Id.* at 72–3, quoting Report of the Reconstruction Committee of the House of Representatives.

17. *See e. g.* comments of Representatives Shellabarger and Farnsworth, *id.* at 228 and 231. According to Representative Bingham, the Fourteenth Amendment was motivated in part as a response to the Supreme Court's decision in *Barron v. The Mayor and City Council of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). In *Barron* the City had condemned private property for public use without compensation. The Court held that there was no remedy available to plaintiff because the first eight Amendments of the Constitution were not limitations on the power of the States. Speaking for the Court, Mr. Justice Marshall held the following:

It saps the foundation of the Government; it destroys the elementary principles of the States; it consolidates everything into one imperial despotism; it annihilates all the rights which lie at the foundation of the Union of the States, and which have characterized this Government and made it prosperous and great during the long period of its existence.[18]

Over these objections, the Fourteenth Amendment was proposed to the legislatures of the States on June 13, 1866, and eventually proclaimed an Amendment by the Secretary of State on July 28, 1868. To those who had fought for the ratification of the Amendment, its import was unmistakably clear. In Representative Bingham's words, the Amendment was the United States' equivalent to England's Magna Charta.[19] Bingham stated further:

These eight Articles I have shown never were limitations upon the power of the States, until made so by the Fourteenth Amendment. The words of that Amendment, 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' are an express prohibition upon every State of the Union, which may be enforced under existing laws of Congress, and such other laws for their better enforcement as Congress may make.[20]

■ An example of a law Congress enacted to "better" enforce the Fourteenth Amendment was the Civil Rights Act of 1871,[21] now codified as 42 U.S.C. § 1983. The basic purpose of Section 1983 was no different than that of either the Act of 1866 or the Fourteenth Amendment. More particularly, Section 1983 was intended as an enforcement mechanism of the Fourteenth Amendment to protect the citizenry from the unconstitutional actions of the States. As expressed by Representative Shellabarger, in introducing Section 1983, it was "necessary affirmative legislation to enforce the personal rights which the Constitution guarantees, as between persons in the State and the State itself." There will be more said on the legislative history of Section 1983 in a moment. It is sufficient for the present to understand that the only limit Congress intended on the parameters of Section 1983 was the outer-reaches of the Fourteenth Amendment itself.[22]

Possibly for this reason, the form of the relief available to prospective litigants was not limited at the time by Congress. The courts were left with wide latitude, as a consequence, to interpret Section One of the Fourteenth Amendment, Section 1983, and the newly reenacted Civil Rights Act of 1866.[23] Seizing the opportunity, the Courts restrictively interpreted the federal government's power to protect the rights created by the Fourteenth Amendment.[24] In fact, the interpretation of the courts was so restrictive, that the civil rights legislation was substantially invalidated. The Supreme Court, for example, in the *Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), completely ignored Congress' intent in enacting the Civil Rights Acts, and interpreted the Fourteenth Amendment as protecting only those rights important to national citizenship, such as the right to transact business with the federal government, and to use the federal seaports. Despite the conservative decisions of the Courts, Congress did not attempt to further reenforce the Fourteenth Amendment with additional legislation. This is probably because in the few years since the enactment of the civil rights legislation, popular sentiment had shifted dramatically as the Nation seemed increasingly concerned about

---

**18.** Flack, *supra* at 78. *See* comments of Representative Hendricks, *id.* at 138.

**19.** *Id.* at 232–33.

**20.** *Id.* at 234.

**21.** 17 Stat. 13 (April 20, 1871).

**22.** *See* discussion of the legislative history of Section 1983, *infra*.

**23.** Ch. 114, 16 Stat. 140 (1870).

**24.** *See Texas v. White*, 74 U.S. (4 Wall.) 700, 19 L.Ed. 227 (1869); *Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1871); *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876).

the expansion of the federal government's powers at the expense of the States. To summarize, by the turn of the century, both Congress and the federal Courts had done very little in the way of actually safeguarding the civil rights of black Americans.

Not until the 1960's did there emerge a new public interest in protecting the civil rights of minority groups, and this interest was reflected in further Congressional legislation.[25] The Supreme Court, as a result, was faced with the task of further defining the limits of Congressional power under the Fourteenth Amendment, and also the scope of Section 1983, which had been "rediscovered" by litigants as an important means by which Constitutional rights could be protected. However, much of this litigation was to be hampered in range and form of requests for relief by the Supreme Court's decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[26] The Court held in *Monroe* that cities could not be sued under Section 1983 for damages growing out of their unconstitutional acts as they are not "person[s]" within the meaning of the statute; *id.* at 187, 81 S.Ct. at 474. This conclusion was based on an analysis of Congressional intent culled from the legislative history of Section 1983. *Id.* at 188–91, 81 S.Ct. at 484–86.

Over a decade later, the Supreme Court expanded the holding in *Monroe*, and its reading of the legislative history of Section 1983, in dealing with the question of whether States could be sued under this provision.

In *Edelman v. Jordon*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court held that "§ 1983 was [not] intended to create a waiver of a State's Eleventh Amendment immunity merely because an action could be brought under that section against state officers, rather than against the State itself." *Id.* at 676–77, 94 S.Ct. at 1362.

The Supreme Court's holding in *Monroe*, that cities were not "person[s]" under Section 1983, and therefore could not be sued for monetary damages, was subsequently reexamined in *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The *Monell* Court partially reversed *Monroe* and decided that cities and counties could be sued under Section 1983 for carrying out policies that cause a deprivation of rights protected by the Constitution. *Id.* at 690–91, 98 S.Ct. at 2035–36. The new position of the Court was prompted by a more complete analysis of the legislative history of Section 1983. Such an analysis, said the Court, reveals that the framers of the Civil Rights Act of 1871 did not intend that municipalities and local governments should be immune from monetary or other forms of relief for violations of the Constitution, and that in fact, Congress approved of such suits. The *Monell* Court also concluded that Section 1983 had been enacted to enforce the Fourteenth Amendment and should be construed broadly against a "person," whether natural or legal, *id.*, 436 U.S. at 700, 98 S.Ct. at 2040.

25. *See* Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., Constitutionality upheld in *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

26. The Supreme Court's inconsistent analysis and application of the Eleventh Amendment and the doctrine of sovereign immunity have added a confusing spectrum with which to view both the legislative history of Section 1983 and the scope of related recent Supreme Court decisions on this issue. In *Pardens v. Terminal Ry.*, 377 U.S. 184, 192, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964), the Court espoused two approaches to the doctrine of sovereign immunity. The first approach maintains that sovereign immunity was surrendered by the States when they joined the Union. A second theory expressed by the Court examines the State's activity that has given rise to the lawsuit to see whether the State constructively waived its immunity by engaging in the course of conduct in question. *Id.* at 194, 84 S.Ct. at 1214. Still a third approach is applied by the Court in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), where States were presumed to be immune from the monetary responsibilities imposed by federal legislation absent a clear indication by Congress that it intends to override the State's immunity. *See also Employees v. Dept. of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (in the absence of a state waiver, Congress must explicitly express its intention to hold states liable for violations of federal law).

The *Monell* decision was controversial for two reasons—firstly, because the Court reversed itself on an issue of far-reaching significance; and secondly, because it raised doubts about the validity of the *Edelman* holding that States were not "person[s]" within the meaning of Section 1983, to the extent that this view was based on *Monroe's* reading of the legislative history of Section 1983.

Since *Edelman*, other Supreme Court decisions on the subject of Congressional power to override the sovereignty of the States [27] have further undermined *Edelman's* holding on the scope of State liability under Section 1983. The first of these decisions, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), was concerned with how clearly federal legislation must express Congress' intention to hold States liable for unconstitutional acts pursuant to Section Five of the Fourteenth Amendment. In balancing Congressional power under Section 5 of the Fourteenth Amendment and principles of State sovereignty, *Fitzpatrick* required a clear expression of Congressional intent before States could be held liable for their unconstitutional conduct; *id.*, at 456, 96 S.Ct. at 2671. The Court concluded in *Fitzpatrick* that Congress, in adopting the Equal Employment Opportunity Act of 1972, had amended Title VII of the Civil Rights Act of 1964 to include "governments, governmental agencies, and political subdivisions," among the employers subject to Title VII's protection against discrimination in employment.[28] Thus, to apply *Fitzpatrick's* clear expression standard to Section 1983, States could not be held liable for monetary damages unless the legislative history of Section 1983 evinced a clear indication that Congress intended to hold States responsible for such damages.

The Supreme Court, however, spoke further on this issue in another decision, *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), which modified the clear expression rule announced in *Fitzpatrick*, and divided the Court as a result. In *Hutto* the Court held that by enacting the Civil Rights Attorneys' Fee Award Act of 1976, now codified as 42 U.S.C. § 1988, Congress intended to override the Eleventh Amendment immunity of the States and authorize attorneys' fee awards payable by the States when their officials are sued in their official capacities.[29] The statutory language of the Attorneys' Fee Award Act, unlike the language of Title VII at issue in *Fitzpatrick*,[30] did not clearly demonstrate Congress' intent to override the sovereign immunity of the States. Significantly, this did not affect the Court's ultimate holding in *Hutto*. The Court, instead, looked to the broadness of the wording of the Act, the lack of any "hint" of it exempting State defendants, the fact that the Act was enacted pursuant to Congress' plenary power under the Fourteenth Amendment, and the legislative history of the Act which, though not specifically saying States were included, strongly suggested that they were.[31]

By utilizing this approach, the Supreme Court's analysis of Congressional intent to override the State's sovereign immunity was more circumspect in *Hutto* than it had been in *Fitzpatrick*. In part, the Court seemed more willing to proceed in this manner because the award of attorneys' fees traditionally has been defined as involving prospective and not retrospective relief.[32] The importance of the difference between the two forms of relief had been reaffirmed in *Edelman*,[33] which held that while the Eleventh Amendment grants the states immunity from paying retroactive monetary relief, it would not prohibit state officers from being subject to prospective injunctive

---

**27.** 427 U.S. at 449 n. 2, 96 S.Ct. at 2668 n. 2.

**28.** See note 26, *supra*.

**29.** 437 U.S. at 700, 98 S.Ct. at 2579.

**30.** 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

**31.** 437 U.S. at 694, 98 S.Ct. at 2575.

**32.** 437 U.S. at 695 n. 24, 98 S.Ct. at 2576.

**33.** 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

relief. Prospective relief is acceptable, said the Court in *Edelman*, because "an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714. . .", 415 U.S. at 668, 94 S.Ct. at 1358. Just the same, in a footnote, the *Hutto* Court aligned its decision with *Fitzpatrick*,[34] which supports the view that, by using a totality of circumstances approach to the issue of Congressional intent to overturn the sovereign immunity of the States, the Court was modifying the clear expression standard of *Fitzpatrick*.

Assuming arguendo that the Court did not intend to modify *Fitzpatrick's* holding in *Hutto*, the net effect of the Supreme Court's ruling in *Hutto* as a result of searching for hints of Congressional intent, invoking the retrospective-prospective relief fiction, and in citing *Fitzpatrick's* articulation of Congress' plenary power under Section 5 of the Fourteenth Amendment, was to dilute and ultimately liberalize *Fitzpatrick's* clear expression standard. This was objected to by Mr. Justices Powell,[35] Burger,[36] and Rehnquist,[37] who believed that the *Hutto* majority had mistakenly eroded the clear intent standard of *Fitzpatrick*, and also *Edelman's* finding that States could not be held accountable for retroactive monetary relief. Furthermore, Mr. Justice Brennan in his concurring opinion went a step further and commented that *Hutto*, when read in light of *Edelman* and *Monell*,

made it "surely at least an open question whether § 1983 properly construed does not make the States liable for relief of all kinds, notwithstanding the Eleventh Amendment."[38]

The turbulence from the different perspectives of the Supreme Court Justices on this issue filtered down into the lower courts, which interpreted the Supreme Court's ruling on this question of federal-state power with diverse results. In the first case, *Skehan v. Board of Trustees of Bloomsburg State College*, 590 F.2d 470 (3rd Cir. 1978), the Court of Appeals wrestled with the matter of whether *Edelman's* holding that States were not "person[s]" within the meaning of Section 1983 had been overruled *sub silentio* by *Fitzpatrick*. The Court of Appeals held that without a clearer indication from the Supreme Court, it could not find that *Edelman* had been overruled. *Id.* at 590 F.2d at 490.

In the other case, *Aldredge v. Turlington*, 47 U.S.L.W. 2370 (N.D.Fla.1978), the District Court held that States were "persons" within the meaning of Section 1983, and that the Eleventh Amendment was not a bar to holding States liable for monetary damages. The *Aldredge* court stated that it was justifying its holding on the basis of *Monell's* broad reading of Section 1983, and that the legislative history cited in *Monell* "indicates that the statute was intended to allow for redress for constitutional wrongs committed by the states." *Id.* at 2370.[39] The Court, moreover, citing *Fitzpatrick*,

**34.** 437 U.S. 698–99 n. 31, 98 S.Ct. 2577–78 n. 31.

**35.** 437 U.S. at 704, 98 S.Ct. at 2581.

**36.** *Id.*

**37.** 437 U.S. at 717, 98 S.Ct. at 2589. Mr. Justice Rehnquist also stated that "I have in addition serious reservation about the lack of any analysis accompanying the Court's transposition of the holding of *Fitzpatrick v. Bitzer*, [citation omitted] to this case.

**38.** 437 U.S. at 703, 98 S.Ct. at 2581.

**39.** The *Aldredge* Court also relied on *Monell's* analysis of the Dictionary Act, or the Act of Feb. 25, 1871, § 2, 16 Stat. 431, which was enacted by Congress two months before the Civil Rights Act of 1871, which provided that "in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." There is no reason, said the Court in *Aldridge*, why States should not be considered a body politic. It is curious that although the Supreme Court in *Monell* cited the Dictionary Act as lending interpretative weight to the proposition that municipalities were "person[s]" within the meaning of Section 1983, in *Quern* the Court conveniently dismissed the usefulness of the Dictionary Act in determining whether States are "person[s]" under Section 1983. *See Quern v. Jordan*, 99 S.Ct. at 1145 n. 11.

went on to find that the Eleventh Amendment is no bar to the maintenance of a lawsuit under Section 1983 for monetary damages against state officials in their official capacities, because this provision was enacted under Congress' plenary power pursuant to Section 5 of the Fourteenth Amendment. *Id.* at 2370–71.

The Supreme Court, perhaps concerned about the lower courts' divided perspective on the scope of Section 1983, decided to end the controversy in *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). In *Quern*, the Court was confronted with the issue of whether a federal district court "may, consistent with the Eleventh Amendment, order . . . state officials to send a mere explanatory notice to members of the plaintiff class advising them that there are state administrative procedures available by which they may receive a determination of whether they are entitled to past welfare benefits." *Id.* 99 S.Ct. at 1141. Most of the Court's opinion in *Quern*, however, discusses the States' status as a "person" within the meaning of Section 1983.

The *Quern* opinion attempts, though does not necessarily succeed, in smoothing out some of the conceptually jagged edges of the *Edelman, Monell*, and *Fitzpatrick* line of cases. The Supreme Court in *Quern* addressed the soundness of *Edelman* after *Monell* by saying that *Edelman's* holding that a State cannot be a "person" for purposes of Section 1983 is still good law, having been reaffirmed in *Alabama v. Pugh*, 430 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). In *Pugh* the State of Alabama had been named as a party defendant in a suit in which plaintiff alleged that the condition of confinement constituted cruel and unusual punishment. The issue in *Pugh* was "whether the mandatory injunction issued against the State of Alabama and the Alabama Board of Corrections violates the State's Eleventh Amendment immunity or exceeds the jurisdiction granted federal

courts by 42 U.S.C. § 1983." *Id.* 99 S.Ct. at 3058 n. 2. The Supreme Court found that the State should not be named as a party defendant.

The implications of *Pugh's* holding, according to the majority opinion in *Quern*, was that a State could not be a "person" within the meaning of Section 1983.[40] The dissent in *Pugh*, however, would disagree with *Quern's* reading of the parameters of *Pugh's* holding. Mr. Justice Stevens, joined by Mr. Justices Brennan and Marshall, stated in his dissenting opinion that the Court could not possibly have meant in *Pugh* to resolve the issue whether a State could be a "person" under Section 1983.[41] The likelihood of the dissent's position being true is reflected in the manner that the Court frames the issue to be resolved in *Pugh* as whether the State consented to be sued.[42] In any event, the *Quern* majority held that "[t]he decision in *Pugh* was consistent both with *Monell*, which was limited to 'local government units,' 436 U.S. at 690 n. 54, and with *Fitzpatrick v. Bitzer* . . . ." *Quern v. Jordan*, 99 S.Ct. at 1145.

The *Quern* Court next examined the events at the time of the adoption of the Fourteenth Amendment and *Monell's* reading of the legislative history of Section 1983, and concluded that pursuant to the clear language test of *Fitzpatrick* or *Hutto*, Congress had not "intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States," *id.* at 1146. Concededly, it would not seem that Section 1983 could meet the strict standards of *Fitzpatrick's* clear language test. But, as the following analysis will demonstrate, Section 1983 would satisfy *Hutto's* totality of the circumstances approach to the clear language test of Congressional intent to abrogate state sovereign immunity.

The first element of the clear language test in *Hutto* is whether the legislation in question was enacted for the purpose of

---

**40.** 99 S.Ct. at 1144–45.

**41.** 98 S.Ct. at 3058, Mr. Justice Stevens, dissenting, footnote.

**42.** *Id.* at 3058.

providing a broad remedy for civil rights violations.[43] In *Monell* the Court concluded that "there can be no doubt that § 1 of the Civil Rights Act [now codified as 42 U.S.C. § 1983] was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." 436 U.S. at 700, 98 S.Ct. at 2041. The second step in *Hutto's* clear language analysis is to determine whether the Congressional legislation at issue gives a "hint," 437 U.S. at 694, 98 S.Ct. at 2575, of excepting States from its proscriptions. *Monell's* analysis of the legislative history of Section 1983 does not give such a "hint."

Section 1983's legislative history is quoted extensively in *Monell* as lending support to the proposition that cities and other local governments are legal "person[s]" within the meaning of Section 1983. Many of the passages of legislative history quoted by the *Monell* Court, however, plainly support the view that in enacting The Civil Rights Act of 1871, the 42nd Congress did intend to hold States liable for violating the Constitutional rights of its citizens. Representative Edmonds, for example, interpreted Section 1983 as a protective measure for rights guaranteed by the Constitution when they are "assailed by any state or under color of any state law, and it is merely carrying out the principles of the civil rights bill [of 1866], which have since become part of the Constitution. . . . [Section 1 is] so very simple and really reenacting the Constitution." 436 U.S. at 684–85, 98 S.Ct. at 2033.

The *Monell* Court continued: "Other supporters were quite clear that § 1 of the Act extended a remedy not only where a State had passed an unconstitutional statute, but also where officers of the State were deliberately indifferent to the rights of black citizens . . . ." 436 U.S. 686–87 n.45, 98 S.Ct. 2033 n.45. Representative Garfield was then quoted as saying that Section 1983 was intended to remedy "a systematic maladministration of [state law]." *Id.* Also quoted by the *Monell* Court was Senator Thurman, one of the critics of Section 1983,

who described the purpose of that provision as authorizing "any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrongdoer in the Federal courts . . . . . [T]here is no limitation whatsoever upon the terms that are employed [in the Act], and they are as comprehensive as can be used." *Id.* at 686, 98 S.Ct. at 2033–34 n.45.

Perhaps the most significant quotations from the legislative history of Section 1983 in the *Monell* opinion, are the statements by Representative Shellabarger, who first explained the purpose of Section 1983 in the Congressional debates. The statements of Representative Shellabarger, quoted at length in *Monell*, can leave no doubt about the scope of Section 1983:

Why not in advance provide *against the denial of rights by States*, whether the denial be acts of omission or commission, as well as against the unlawful acts of combinations and conspiracies against the rights of the people?

The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws; because all State officials are by the Constitution required to be bound by oath or affirmation to support the Constitution. As I have already said, the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. . . . They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy. They bought and sold men who had no remedy. Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in States *and by States*, or combination of persons?"

---

**43.** 437 U.S. at 694, 98 S.Ct. at 2576.

436 U.S. at 685, 98 S.Ct. at 2032. Toward this end, Representative Shellaberger described how the Act of 1871 should be construed by the Courts:

> This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation.

436 U.S. at 684, 98 S.Ct. at 2032.

Thus, the purpose of Section 1983, according to its legislative history, is to redress violations of "human liberty and human rights" committed by the States, state officials, or under color of state law. In view of these goals, it is difficult to comprehend how the preservation of the conceptually mired doctrine of state sovereignty could be viewed as more important in any court of law.

The last element of *Hutto's* clear language test is whether the legislation in question "primarily applies to laws passed specifically to restrain state action." 437 U.S. at 694, 98 S.Ct. at 2575. Section 1983 certainly fulfills this requirement, and that it does is admitted by the *Hutto* Court which cites Section 1983 as an example of legislation aimed at restricting state action. 437 U.S. at 694.

■ It is clear then, that Section 1983 does meet all of the criteria required by *Hutto* to prove that Congress enacted it with the intent to override state sovereign immunity under the Eleventh Amendment. It cannot be emphasized enough that the central concern of the framers of the Civil Rights Act of 1871 was the preservation of human liberty and human rights, which they understood to be protected as against the federal government by the Bill of Rights, and as against the States by the Thirteenth, Fourteenth and Fifteenth Amendments. Such a reordering of federal-state relationships, moreover, was a conscious decision by the Nation as a whole. The popularly held belief at the time by the House of Representatives,[44] state legislators,[45] the press [46] and the people was that as a result of the Civil Rights Acts, the sovereignty of the States would be limited in favor of the federal government. In putting the federal government in a superior position to that of the States for purposes of the Fourteenth Amendment, the Nation was not merely expressing notions of constitutional philosophy, it was responding to abuses by the States of the civil rights of the people.

There is no evidence that unconstitutional state action is any less a problem today than it was in the nineteenth century. Certainly, the importance of Section 1983 as a remedy for unconstitutional state conduct, and the sheer volume of cases of recent date that have been brought under it, have in no small measure led to the Supreme Court's reversal of its stance on the legislative history of Section 1983 in *Monell*. But it is also evident from the holding in *Quern*, that the Court has chosen to unnecessarily limit the scope of Section 1983 in much the same manner as the Supreme Court did in the Reconstruction years.[47]

■ Reluctantly, this Court is bound by *Quern's* limited reading of the legislative history of Section 1983 and its holding that a State is not a "person" within the meaning of the statute. The Court today must reject the persuasive and haunting voices of a previous era which would not let any form of body politic claim superiority over the Constitutional rights of the people. The Court therefore grants the motion to dismiss by defendants State of New York, State Police Department, and the Superintendent of State Police, William G. Connelie in his official capacity, for the failure of

---

**44.** *See supra* pp. 217–223 and accompanying footnotes.

**45.** Flack, *supra* note 7, at 161–211.

**46.** *Id.* at 140–60. One newspaper writer viewed the enactment of the Fourteenth Amendment as reducing the status of States to that of counties, *id.* at 140.

**47.** See *supra* pp. 219–221.

plaintiffs to state a claim upon which relief can be granted. With respect to defendants County of Madison, City of Oneida, Herbert Brewer, Mayor, City of Oneida Police and Fire Departments, Ellsworth Yemen, Chief of Police, and John F. Myers, Fire Chief, their motions to dismiss are denied pursuant to *Monell*. However, the alleged actions of defendants Connelie, Brewer, Yemen, and Myers, are subject to the good faith standard of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), to the extent that these defendants are named in their individual capacities. Thus, to have an actionable claim, plaintiffs must prove that their Constitutional rights have been violated, and that the individual defendants

> knew or reasonably should have known that the action [they] took within [their] sphere of official responsibility would violate the constitutional rights of the [plaintiffs] affected, or if [they] took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiffs].

*Id.* at 322, 95 S.Ct. at 1011. Because plaintiffs' complaint can be construed to allege the requisite discriminatory animus under Section 1983, the Court believes that plaintiffs are entitled to offer evidence on whether defendants' conduct violates *Wood's* good faith standard.

### D. State Action

■ In order to meet the jurisdictional prerequisites of Section 1983, plaintiffs must first establish that defendants have acted "under color of state law," which is otherwise known as the state action requirement. In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), the Court held that for state action to exist there must be a "sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself."

■ In the case at bar, the only contact between the Oneida Warrior Society and its members and the "state" was a meeting the Warrior Society had with the City of Oneida in the month of October, 1975. This contact is purely private action and is not even the subject of the Section 1983 claim, which concerns the allegedly discriminatory action of the government and government-related defendants in withdrawing police and fire protection from plaintiffs. The Oneida Warrior Society and its members are therefore dismissed under the Section 1983 claim for relief.

### E. Unconstitutional Policy

■ Although the Supreme Court held in *Monell* that municipalities may be found liable for monetary damages under Section 1983, the Court limited its holding to Constitutional violations flowing from policies set by a defendant municipality. This raises the issue in the present case whether the withdrawal of police and fire protection by the municipal defendants could be categorized as a "policy" for purposes of Section 1983. The Court believes that it should be.

■ Generally, a policy decision affects the governmental operations of the municipality. Plaintiffs allege that they were denied police and fire protection because they are Indians, relatives of Indians or residents of the Oneida Indian Reservation. If true, this represents a deliberate policy intended to deny plaintiffs the services of the city and county because of plaintiffs' race or relationship to a race. Consequently, the Court believes that plaintiffs are entitled to present evidence to support their claim under Section 1983 against defendants County of Madison, and City of Oneida.

### III. Plaintiffs' Claim Under Section 1985

■ Plaintiffs' complaint can also be construed to assert that defendants conspired to deprive plaintiffs of the equal protection of the laws in violation of the Fourteenth Amendment and 42 U.S.C. § 1985(3). To plead a claim for relief under Section 1985, plaintiffs must satisfy the criteria of *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971), and allege that

the defendants did (1) 'conspire or go on the highway or on the premises of another' (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. [The complaint] must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

Liberally construed, plaintiffs' complaint does allege that defendants conspired to deny plaintiffs police and fire protection. In addition, it asserts that the conspiracy was for the purpose of denying plaintiffs as Indians, relatives of Indians, or residents of the Oneida Indian Reservation, the equal protection of the laws, and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States, including such rights as freedom of association, speech, education, and to be secure in their persons, houses, papers, and effects. These allegations sufficiently support the required animus to deprive plaintiffs of the equal enjoyment of legal rights because of their race. Furthermore, the claim of a meeting and withdrawal of police and fire protection fulfills the requirement of acts done in furtherance of a conspiracy. And finally, plaintiffs assert that they suffered personal injuries because of the conspiracy. Plaintiffs have thus stated a claim for relief under Section 1985(3).

It remains to be considered whether all of the defendants in this action can be included as "person[s]" within the meaning of Section 1985(3). In resolving this issue, generally the same principles applicable to the definition of a "person" under Section 1983 are relevant. Accordingly, *Quern v. Jordan*, 99 S.Ct. 1139 (1979), dictates that the State defendants, with the exception of the state officials in their individual capacities, *see Wood v. Strickland*, 420 U.S. 308, 75 S.Ct. 992, 43 L.Ed.2d 214 (1975), are not "person[s]" within Section 1983, nor therefore Section 1985(3). Municipalities, their agencies, and employees, on the other hand, are now considered to be "person[s]" under Section 1983, *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and would also be "person[s]" under Section 1985(3). The only distinction between "persons" under Section 1983 and Section 1985(3) concerns private individuals. As the Supreme Court held in *Griffin v. Breckenridge*, 403 U.S. 88, 101, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), "all indicators—text, companion provisions, and legislative history—point unwaveringly to Section 1985(3)'s coverage of private conspiracies." Thus, there is no state action requirement under Section 1985(3) that would exclude purely private conduct from the provisions of the statute.

In the instant case, the State defendants' motion to dismiss, with the exception of William G. Connelie in his individual capacity, are granted under plaintiffs' Section 1985(3) claim. Moreover, the motions to dismiss by defendant municipalities, their agencies, and officials are denied. The Oneida Warrior Society and its individual members are proper party defendants under plaintiffs' Section 1985(3) claim.

### IV. Plaintiffs' Claim Under 42 U.S.C. § 1986

Plaintiffs allege that defendants, with the knowledge of the conspiracy to unconstitutionally withdraw police and fire protection from the Oneida Indian Reservation, had the power to prevent the conspiracy, but ultimately refused to do anything to stop it, in violation of 42 U.S.C. § 1986. In addition, plaintiffs maintain that they suffered "severe damage" as a result of defendants' conspiratorial actions, which plaintiffs say continue to the present day. Defendants argue that plaintiffs' complaint was filed more than one year after the alleged events which gave rise to the instant action, and is consequently time barred.

Section 1986 provides that any person with knowledge of a conspiracy to deprive others of their constitutional rights,

and having power to prevent such conspiracy, and who neglects or refuses to prevent it, and wrongful acts are ultimately committed, will be liable to the parties injured. This provision is read in conjunction with Section 1985, so that, absent a legitimate claim under Section 1985, a plaintiff is without a claim for relief under Section 1986. *Martin Hodas v. East Coast Cinematics*, 431 F.Supp. 637 (S.D.N.Y.1977).

In that plaintiffs have stated a claim for relief under Section 1985, *see* Section III, *supra*, and have alleged that defendants were aware of the conspiracy, but did not attempt to prevent it from accomplishing its purpose, plaintiffs have also stated a claim for relief under Section 1986. Nevertheless, defendants contend that plaintiffs' Section 1986 claim is barred by the one year statute of limitations applicable to such an action. Plaintiffs have, however, asserted that the Section 1985 conspiracy is ongoing. Since the Court has not been apprised of sufficient information to conclude differently, it cannot hold that plaintiffs' claim for relief is time barred. Should defendants subsequently prove to the satisfaction of the Court that a Section 1985 conspiracy never existed, or in the alternative, that it ceased to exist within a year after it began in October, 1975, then plaintiffs' Section 1986 claim must be dismissed. Yet, until this is proven, with the exception of defendants State of New York, the State Police Department, and William G. Connelie in his official capacity, defendants' motions to dismiss are denied.

### V. Plaintiffs' Claim Under 25 U.S.C. § 1302

Lastly, plaintiffs claim that because defendants withdrew police and fire protection from the Oneida Indian Reservation, plaintiffs' rights under 25 U.S.C. § 1302, popularly known as the Indian Civil Rights Act of 1968 were violated. The purpose of Section 1302 is to prohibit Indian Tribal Governments from violating the civil rights of individual members of an Indian tribe. Plaintiffs do not allege here that the Oneida Warrior Society or its members represent the Oneida Tribal Government. Also germane to the instant case is a recent Supreme Court decision, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 66, 98 S.Ct. 1670, 1681, 56 L.Ed.2d 106 (1978), where it was held that habeas corpus relief, and not a private cause of action for injunctive or declaratory relief, was the only enforcement method authorized by Congress under Section 1302. Thus, in the present case, Section 1302 is inapposite, and plaintiffs' claim under this provision must be dismissed.

### VI. Conclusion

For the reasons foregoing, under plaintiffs' Section 1983 claim, the motions to dismiss by defendants State of New York, State Police Department, and the Superintendent of State Police, William G. Connelie in his official capacity are granted. Moreover, the Oneida Warrior Society and its members are dismissed as party defendants. The motions to dismiss by defendants County of Madison, City of Oneida, Herbert Brewer, Mayor, City of Oneida Police and Fire Departments, Ellsworth Yemen, Chief of Police, and John F. Myers, Fire Chief, are denied. Also denied are the motions to dismiss by defendants Connelie, Brewer, Yemen, and Meyers, insofar as they are named in their individual capacities.

As for plaintiffs' Section 1985 claim, the motions to dismiss by the State defendants are granted, except for William G. Connelie, who is named in his individual capacity. The Oneida Warrior Society and its individual members are proper party defendants under this provision. The same result is applicable with respect to plaintiffs' claim under Section 1986. Finally, plaintiffs' claim under Section 1302 is dismissed, as are the unnamed police officers that were not served by plaintiffs.

It is so ordered.